1998-NMCA-157

967 P.2d 1136

**Ernest Ray ENRIQUEZ and Brenda Enriquez, individually and as parents of Mark Lee Enriquez, a minor and Crystal Renee Enriquez, a minor child, Plaintiffs–Appellees/Cross–Appellants,**

v.

**Larry P. COCHRAN, individually and as a volunteer of the Boy Scouts of America and Boy Scouts of America, Inc., Defendants–Appellants/Cross–Appellees.**

Nos. 17,832, 17,912.

Court of Appeals of New Mexico.

July 30, 1998.

Certiorari Denied, No. 25,365, Oct. 13, 1998.

Randi McGinn, McGinn & Associates, P.A., Albuquerque, Wesley Reid Bobbitt, Albuquerque, for Plaintiffs–Appellees/Cross–Appellants.

John A. Klecan, Butt, Thornton & Baehr, P.C., Albuquerque, Stevan Douglas Looney, Crider, Calvert & Bingham, P.C., Albuquerque, for Defendant–Appellant/Cross–Appellee Boy Scouts of America, Inc.

Cas F. Tabor, Denise Madrid, McCormick, Caraway, Tabor & Madrid, Carlsbad, for Defendant/Cross–Appellee Larry P. Cochran.

## OPINION

BUSTAMANTE, J.

{1} In 1992 Ernest Ray Enriquez (Plaintiff) was severely injured when the top twenty feet, or so, of a tree he was helping to cut down broke off and fell on him. He brought suit against Larry P. Cochran (Cochran) one of the persons helping with the tree felling, and against the Boy Scouts of America, Inc. (BSA). The jury assigned seventy-five percent of the fault for Plaintiff's injuries to BSA and divided the remaining twenty-five percent of fault between Plaintiff (ten percent) and his employer, the Conquistador Council of Boy Scouts of America (fifteen percent).

{2} BSA appeals, asserting that the trial court erred when it: (1) struck certain of BSA's affirmative defenses as a discovery sanction; (2) granted Plaintiff's motion to amend his complaint to conform to the evidence; (3) failed to hold as a matter of law that BSA was Plaintiff's statutory employer and thus immune from tort liability under the exclusive remedy provisions of the New Mexico Workers' Compensation Act (WCA) NMSA 1978, §§ 52–1–1 to –70 (1929, as amended through 1993); (4) refused certain of BSA's requested jury instructions while giving certain of Plaintiff's requested jury instructions; and (5) admitted evidence regarding use of hard hats and a tree felling death which occurred after Plaintiff's injury.

{3} Plaintiff cross appeals asserting the trial court erred in: (1) failing to impose joint and several liability on BSA because felling large trees is an inherently dangerous activity and BSA retained sufficient control over local activities, including scout camp maintenance, that joint and several liability is appropriate as a matter of public policy; (2) directing a verdict against Plaintiff on his

punitive damages claim against BSA; (3) refusing Plaintiff's proposed form of special verdict; and (4) failing to require BSA to post a supersedeas bond pending appeal. In addition, Plaintiff appeals from the verdict against Cochran based on assertedly improper references to Cochran's financial status during the closing arguments.

{4} We affirm as to all issues raised by BSA in its appeal. On Plaintiff's cross-appeal we reverse as to the joint and several liability issue and affirm on the remainder. We reverse Plaintiff's appeal with regard to Cochran.

## FACTS AND PROCEEDINGS

{5} Because of the complexity of the factual and procedural history of certain issues, this section of the opinion will identify the parties in the case and other actors involved in the occurrence, as well as provide a description of the occurrence itself. Background appropriate to explain our decision with regard to particular issues will accompany specific discussions.

### I. The Parties

{6} At the time of his injury, Plaintiff was a professional scouter employed by the Conquistador Council (Council) as a district executive. It is undisputed that he was acting within the course and scope of his employment when he was injured. Thus, Plaintiff's injury was covered by the WCA, and Plaintiff received worker's compensation benefits, including medical care and disability payments. Under the exclusive remedy provisions of the WCA, the Council was immune from suit in tort, and thus is not a named party. However, the Council was included on the special verdict form as an entity potentially bearing some responsibility for Plaintiff's injuries, thus allowing the jury to assign a percentage of comparative fault to it.

{7} The Council is a New Mexico non-profit entity incorporated under articles of incorporation specified by BSA. Under BSA's standard articles of incorporation, the Council shall:

1. have "perpetual existence but shall take such action as may be necessary to dissolve in the event of the revocation or termination of its charter" from BSA. In the event of dissolution or liquidation of the Council, all of its property and assets shall be distributed to another local council as specified by BSA or to BSA for use in furtherance of scouting;

2. promote "[s]couting" within the territory covered by its charter from BSA "in accordance with the Congressional Charter, Bylaws and Rules and Regulations" of BSA, using the methods in common use by BSA;

3. maintain the principles and policies of BSA "as set forth in detail in the Bylaws and the Rules and Regulations of the Boy Scouts of America in official handbooks...."; and

4. not amend the articles of incorporation without approval of "an authorized official at the national office" of the BSA.

{8} The Council operates as a corporation under bylaws prescribed by BSA. The bylaws provide organizational directives for management of the Council and generally reinforce the notion that the "responsibilities of the corporation shall be controlled and directed by the Boy Scouts of America through its Bylaws and Rules and Regulations." The Council holds its property, real and personal, in its own name, subject to the ultimate limitation of forfeiture or transfer in the event of termination of the Council's charter from BSA. Under the BSA prescribed bylaws, the Council's fund raising activities and expenditures are subject to the Rules and Regulations of BSA.

{9} According to its Charter and bylaws, BSA is a non-profit corporation chartered by the United States Congress in 1916 charged with the purpose of promoting " 'through organization, and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in Scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using the methods which are now in common use by Boy Scouts.' "

{10} BSA bylaws describe a four-tier organizational structure with a national council, regional organizations which are geographic

administrative subdivisions of the national council, local councils (such as the Conquistador Council), and individual troops of scouts. The regional organizations are charged with responsibility for the "proper alignment of councils, for assuring sufficient qualified volunteer and professional leadership in each council, and for an effective program for financing each council."

{11} BSA's bylaws provide: "In order to accomplish its purposes and to carry out its programs, the Corporation [BSA] will charter local councils each with jurisdiction over a prescribed geographical area." Local council charters are issued for a period not exceeding one year, and may be renewed annually upon application showing a satisfactory effort to meet the responsibilities of a local council. BSA's bylaws reserve in BSA the right to "revoke or decline to renew such charters for failure to comply with the Bylaws, Rules and Regulations, or policies of the Corporation." BSA's bylaws further provide that the "powers and responsibilities of local councils shall be controlled by these [BSA] Bylaws and by the Rules and Regulations."

## II. *The Injury*

{12} There is no significant dispute between the parties concerning the course of events leading to Plaintiff's injury. The Council owned Camp Wehinahpay—located in southeastern New Mexico—and operated it as a resident summer camp for boy scouts. On the weekend of May 16, 1992, Plaintiff and other volunteers, including Defendant Cochran, were asked to cut down a number of dead trees on Camp Wehinahpay as part of pre-season preparation for summer activities. Two or three of the trees to be felled were approximately sixty feet tall. The tree which eventually injured Plaintiff was an aspen located on a hillside near a power line. The top branches of the dead aspen were intertwined with a nearby live tree. In an attempt to avoid having the tree fall toward, and hit the power line, the volunteers set up a winch and pulley arrangement using Cochran's winch truck. The winch cable was tied to the dead aspen some fifteen to twenty feet above the ground, strung through a pulley attached to another tree opposite the power line, then run down the hill and hooked to Cochran's winch truck located at the bottom of the hill. The truck was located approximately two hundred feet from the dead aspen.

{13} While the men at the tree worked to cut it with chain saws, Cochran stayed at his truck using the winch in an attempt to guide the tree's fall away from the power line. Because of the distance between the tree and the winch truck, Cochran could not see or hear the chain saw operator as he cut the tree. As the tree was being cut, tension was placed on the cable, pulling it in the desired direction of fall. As the tree fell, the top twenty or so feet broke off backwards, toppling into the "safety zone" behind the tree where Plaintiff and other volunteers were standing. The broken piece fell on Plaintiff, causing serious and permanent brain damage and other physical injuries.

{14} None of the volunteers were given any training or provided with any safety equipment before being asked to cut these trees. Some of the workers, including Plaintiff, had never even used a chain saw before the day of the accident.

{15} Dick Davis, who was employed by the Council as the Council Ranger and thus covered by the WCA, was in charge of removing the trees on the day Plaintiff was injured. The crew took their instructions from him, including where to stand as he cut the tree using the chain saw. It was Davis who told Cochran how to set up the pulley and cable arrangements described above.

{16} In addition, Davis conducted the pre-opening inspection and identified the dead trees which needed to be cut down. It is uncontradicted that no BSA employees were present as the tree cutting operation proceeded the day Plaintiff was injured. Thus, BSA had no direct or specific knowledge as of May 16, 1992, that Plaintiff and the others would be cutting down the particular tree that injured Plaintiff.

{17} The pre-opening camp inspection was conducted in accordance with BSA policy setting national standards for Boy Scout Resident Camps. BSA pre-opening guidelines and check lists provide a uniform pro-

gram of inspection and set minimum standards for BSA accredited facilities. Local Councils are free to impose higher standards if they desire. The inspection protocol included checking for "[d]anger from falling limbs or trees[.]" The BSA national standards included, as part of general camp items, inspection for the following: "Campgrounds, program areas, and camp facilities are clean, neat, and free from hazards. Hazardous dead trees or limbs, especially those near inhabited areas, trails, and electric lines, have been removed." Completed checklists are sent to the applicable regional service center along with the Council's "Application for Operating a Resident Scout Camp." Items found to be deficient must be corrected before camp opens. Failure to comply with camp safety guidelines can result in failure of accreditation, disapproval of the camp for scout activities and, finally, termination of a Council's charter.

## BSA APPEAL

### I. Discovery Sanction

{18} On the first day scheduled for trial, the district judge granted Plaintiff's Motion for Sanctions based on BSA's failure to adequately respond to discovery requests. As the sanction, the district judge struck three of BSA's seven affirmative defenses. The three struck were worded as follows:

5. The Complaint fails to state a claim upon which relief can be granted against Boy Scouts of America.

6. Boy Scouts of America denies that it franchised Conquistador Council or otherwise controlled the council's activities as alleged by plaintiffs. However, if plaintiffs contend that the Boy Scouts of America controlled the activities of the local council, then the exclusive remedy is pursuant to the Worker's Compensation Act.

7. Plaintiff's allege agency by estoppel. However, Ernest Enriquez was an employee of the council and the one responsible for obtaining the volunteers. He therefore had no justifiable reliance on any claim for estoppel. While defendant denies that Larry Cochran was negligent or otherwise responsible for the occurrence, the defen-

dant also affirmatively states that any conduct on his part is not attributable to the Boy Scouts of America and constitutes separate conduct.

The sanction also had the effect of determining that BSA retained sufficient control over local activities, including camp inspection and clean up, to impose a duty of care on it toward persons engaged in such activities as felling large trees.

$19$ BSA generally asserts that any sanction was inappropriate, or in the alternative, that the sanction imposed was disproportionally severe.

### A. Standard of Review

■ {20} We review the district court's actions under the abuse of discretion standard. See Gonzales v. Surgidev Corp., 120 N.M. 151, 157–58, 899 P.2d 594, 600–01 (1995); United Nuclear Corp. v. General Atomic Co., 96 N.M. 155, 239, 629 P.2d 231, 315 (1980). Under this standard we consider the full record to determine whether the trial court's decision is without logic or reason, or clearly unable to be defended. See Gonzales, 120 N.M. at 157, 899 P.2d at 600. In conducting our review we must be mindful of the nature of the conduct and level of culpability found by the trial court and whether the trial court's sanction appears more stern than necessary in light of the conduct prompting the sanction. Id. at 158, 899 P.2d at 601; see also United Nuclear Corp., 96 N.M. at 241, 629 P.2d at 317. Because the trial court's decision must be based on its conclusions about a party's conduct and intent, implicit in the standard of review is the question of whether the court's findings and decision are supported by substantial evidence. See Gonzales, 120 N.M. at 158, 899 P.2d at 601.

■ {21} In addition, part of our calculus includes a review of the trial court's exploration of alternatives to the sanctions ultimately imposed. This latter inquiry is not strictly required here since the trial court did not impose the ultimate sanction of directing a judgment of full liability against BSA, but the subject recommends itself as a generally useful exercise both on appeal and for the trier in the first instance. Id; see

*also United Nuclear Corp.,* 96 N.M. at 238–242, 629 P.2d at 314–318.

### B. *Background*

{22} The complaint joining BSA as a Defendant was filed on March 31, 1995. In April 1995, before BSA was required to answer, the trial court held a scheduling conference at which, among other items, the trial court vacated a May 22, 1995, trial setting; reset the matter for trial in October 1995; and extended the time for discovery to August 29, 1995, with a pretrial conference to be held on October 3, 1995.

{23} On August 16, 1995, Plaintiff served Requests for Production on BSA pursuant to Rule 1–034 NMRA 1998 of the Rules of Civil Procedure. This set of Requests for Production has been referred to by the parties as the "long set" and we adopt this nomenclature. On August 31, 1995, Plaintiff served a second set of Requests for Production on BSA. We will refer to this set of requests as the "short set," again adopting the parties' nomenclature.

{24} On September 25, 1995, Plaintiff filed a motion to compel response to the long set of Requests. The motion recited that after granting counsel for BSA an extension of time to respond, BSA had failed to produce or make available for review any documents, and instead had responded only with improper objections as to request numbers 9, 10, 14, 24–26, and 32. The record reveals no response at all as of that time to the other thirty requests which comprised the long set. On October 2, 1995, BSA filed two certificates of service stating that BSA responded to the long and short sets on September 29, 1995.

{25} The motion to compel was heard by the trial court on October 3, 1995, in conjunction with the pretrial conference previously scheduled. During the hearing and in its order on Plaintiff's motion to compel, the trial court overruled BSA's objection to request numbers 9, 10, 14, and 32. The order also states that BSA's objections to request numbers 24, 25, and 26 were overruled. BSA complains that at the hearing the trial court actually reserved ruling on these requests and that the order was to that extent incorrect. The transcript of the hearing bears out BSA's position about the trial court's oral ruling. However, we frankly fail to see how this is of any aid to BSA at this point. Formal written orders filed of record normally supersede oral rulings, and oral rulings cannot normally be used to contradict written orders. *See State v. Morris,* 69 N.M. 89, 91, 364 P.2d 348, 349 (1961) ("An oral ruling by the trial judge is not a final judgment. It is merely evidence of what the court had decided to do but he can change such ruling at any time before the entry of a final judgment."). Further, BSA approved the form of the order without reservation, thereby waiving any objections it may have had to the error. *See Pizza Hut of Santa Fe, Inc. v. Branch,* 89 N.M. 325, 328, 552 P.2d 227, 230 (Ct.App.1976) (party waives appellate review of order by failing to object to form of modified order in court below).

{26} At the October hearing, Plaintiff's counsel also voiced general concern about the adequacy of BSA's other responses to the discovery, characterizing them as "virtually a transverse avoidance of the brunt of the discovery items[,]" and worrying that improper responses would limit Plaintiff from properly addressing the extent of BSA's control of scouting activities, the central issue in the case. Rather than deal with the specifics of BSA's responses at that point, the trial court reserved ruling on the "question of inadequacy as opposed to objection." In doing so, the trial court prevailed on the parties to attempt to resolve the adequacy issues among themselves. The court made it clear, however, that it expected good-faith compliance with discovery rather than "games." The Court also stated, addressing counsel for BSA, "I'm going to accept your assertion that we're not having any games here. If I find out later through some other source, if it comes up, *United Nuclear* sanctions would seem mild by comparison. Is that fair?"

{27} On March 4, 1996, the parties met with the trial court for another pretrial conference. As of then, BSA had not provided a formal response to Plaintiff's requests for production. The discussion at the conference centered on problems arising in scheduling

and completing the depositions of Council and BSA representatives and witnesses, as well as the lack of response to the short and long sets of requests. The parties also discussed the right of Plaintiff to depose persons within BSA's structure that BSA objected to deposing, including risk management personnel, training personnel, and the BSA engineering staff. Plaintiff clearly stated that his theory of liability against BSA was based on the ability of BSA to strongly influence, if not control, the activities of the Council and individual scout troops through its control over the national scouting program. The trial court allowed essentially all of the depositions and document discovery Plaintiff requested. BSA promised to provide formal responses to the short and long set requests "by Friday."

{28} On March 22, 1996, BSA filed a certificate of service giving notice that it had mailed its responses to the short and long sets of requests to Plaintiff on March 20, 1996. On April 19, 1996, Plaintiff filed his second motion to compel, this time seeking sanctions. This motion was heard by the trial court on April 29, 1996, as part of a second, previously scheduled pretrial conference. Plaintiff complained again about BSA's lack of discovery responsiveness, in particular with regard to safety issues, control issues, and prior, similar injury-causing incidents. Plaintiff complained that as of the time of that hearing, there was literally no response to some discovery, and no signature page or verification had been provided by BSA for its interrogatory responses. Plaintiff also recounted that in the course of deposing the BSA director of risk management, he discovered that BSA maintained a data base containing a history of injuries and accidents involving scouting activities nationwide. Plaintiff felt this was contrary to prior information and representations from BSA asserting that a search for prior incidents would require a paper file by paper file search. Counsel for BSA attempted to assume responsibility for the discovery shortcomings, asserting that he had misunderstood the prior orders of the court and prior correspondence and conversations with opposing and co-counsel.

{29} Apparently agreeing that there were significant issues raised by Plaintiff's motion, the trial court expressed concern about the state of discovery. Noting that trial was but one week away, the trial court reflected that its choices for response to the problem were limited; that is, vacate the trial and extend discovery, or "force feed" discovery, or impose sanctions including the *United Nuclear* option." The trial court was concerned that the trial date not be affected because it would be several months before it would be able to give the parties another two-week block of time. Given that the parties were already four years post Plaintiff's injury, Plaintiff was not anxious or willing to put off the trial. The trial court reserved ruling on the sanctions motion, but let counsel know: "I'm bothered by this. I really am."

{30} The trial court next took up discovery issues and Plaintiff's motion for sanctions on the first day of trial, after a jury had been selected. Plaintiff again related the litany of difficulties discussed at the April 29 pretrial conference, most of which were still outstanding. BSA had provided a partial response concerning prior injuries, though it was limited to New Mexico events, and was incomplete even then in that it did not identify the parties injured or the nature of their injuries. Plaintiff alerted the trial court to BSA's continued failure to respond definitively and unambiguously to long set request number eleven concerning BSA's involvement in the "training, supervision and use of volunteers...." The inadequacy of BSA's response was highlighted by the fact that Plaintiff had discovered certain relevant BSA materials independently. In addition, Plaintiff argued that BSA had essentially failed to respond in any meaningful way to long set request numbers 12 and 14 and that the response to long set request number 24 was, again, limited to the incomplete response outlining injuries occurring in New Mexico only. Finally, Plaintiff complained about the evasiveness of certain BSA employees during the course of their depositions.

{31} BSA's response was four-fold. First, BSA asserted that some of the material (the Alerts file, the New Mexico claims,

and the loss prevention newsletters) had been provided, even though only just before the trial. Second, BSA asserted that much of the material requested did not exist. For example, BSA asserted there were no other incidents similar to Plaintiff's in its file. Third, BSA asserted some problems arose from a difference of opinion between counsel interpreting the reach of certain requests, in particular long set request number 12. Primarily, however, counsel for BSA attempted to accept personal responsibility for the shortcomings evident in BSA's formal responses and actual production. Counsel asserted he simply misunderstood the tenor and effect of the Court's prior orders and of the correspondence from Plaintiff's counsel detailing their concerns with progress, or lack thereof, in providing discovery.

{32} At the conclusion of the argument on the motion, the trial court ruled as follows:

Folks this is a mess. We have a jury selected, we have a jury seated, we have witnesses here and yet there is more information which is relevant and discoverable which hasn't been produced. I'm going to find that there has been a pattern of continuing discovery abuse on behalf of the defendants Boy Scouts of America in violation of my previous orders and in repeated violation of previous orders. I'm going to take a recess for a little while and consider what sanctions to impose.

After taking a recess, the trial court stated his order on sanctions as follows:

Folks be seated please. Folks since our last set of motion hearings on this case, I have read I think almost all of Rule 37 sanction cases that we have here. I think perhaps the longest of those, certainly longest cases that I remember reading are behind the *Nuclear* sanctions. I can't think of any other remedy that's now with a jury impaneled. I rule then to strike the defenses available to the Boy Scouts and will continue on the course of litigating damages as it applied to Boy Scouts.

The next day, BSA, with the help of additional counsel, asked the trial court to reconsider its ruling. The trial court dismissed the jury for the day and allowed BSA to argue at length. The gist of BSA's argument at this point was that the problems identified by Plaintiff were the result of mere good-faith errors and misinterpretations and did not rise to the level of willfulness or bad faith necessary to support the "drastic" sanction the trial court had imposed.

{33} The trial court's response to this argument is instructive. The trial court summarized the series of hearings it had held concerning discovery issues. The trial court then concluded that this sequence of hearings, and his own contact with counsel for BSA, convinced him that BSA itself had been at fault, and in fact had chosen to make it difficult to get information or had chosen not to provide the information. The essence of the trial court's view was that BSA's discovery shortcomings were not merely accidental or inadvertent. The trial court also noted it had forewarned the parties about the potential consequences of failing to conduct discovery in good faith.

{34} Finally, the trial court reconsidered the options available to it. It discounted the idea of vacating the trial and ordering yet again more production as unfair to Plaintiff and likely ineffectual. The trial court equated the sanctions he chose—striking affirmative defenses which depended on a finding of BSA control or responsibility for local actions—with an order directing the jury to find that certain elements of a case had been proven because of missing documents.

{35} At the conclusion of counsel's argument, the trial court allowed BSA to present the testimony of John Vesel, the BSA casualty claims supervisor who had supervised this file for BSA "since the lawsuit was filed against Mr. Cochran." Since Mr. Vesel had been responsible for coordinating responses to discovery requests for BSA, he was presented to explain what actually had been done by BSA and what information was reasonably available from it. Unfortunately, Mr. Vesel did not have his adjustment file with him and he was not able to provide particularly specific information concerning his activities in this case. He was able to identify generally the material he produced and the manner in which the BSA data base

had been searched for tree felling or tree cutting injuries.

{36} Of significance were Mr. Vesel's admissions that:

1. He never conducted a search to find information fully responsive to Interrogatory # 12;

2. He never did a search aimed at finding injuries from machinery or equipment in response to long set requests numbers 24, 25, and 26;

3. He limited his search for injuries to New Mexico even though he had requests for nationwide information;

4. His approach to answering discovery requests is to limit them to the extent possible, though he recognized they could not be unilaterally narrowed by him or BSA;

5. In responding to long set request number 11, asking for all policies, procedures, manuals, etc. concerning training, supervision, and use of volunteers, BSA responded that there were "no specific documents regarding training or supervision of volunteers" even though he recognized there were numerous BSA documents that "talk about volunteers";

6. He could not recall whether he even reviewed the BSA list of publications to see if any might provide information relevant to the interrogatories or document requests;

7. He could not specifically recall seeing the long set of requests;

8. The BSA Guide to Safe Scouting is produced by the risk management division, Mr. Vesel's area within the BSA organization;

9. All reports received by BSA involving injuries to scouts, employees, or volunteers are funneled to the risk management division as a matter of course, and BSA did not produce these reports because Mr. Vesel understood the request to be for "claims" even though the request specified "injuries";

10. The computer run he produced for New Mexico did not contain any detail, such as the report which generated the file, even though he could have produced such information;

11. As late as Monday before trial, Mr. Vesel was requested again to provide computer-generated information for New Mexico related injuries only, although he could have run the information nationwide for a ten-year period (with a caveat about the quality and quantity of information available before September 1992 when a new program was installed);

12. He could use the computer print out information to refer to BSA paper claim files;

13. A computer generated report for a nationwide, ten-year run would have taken a few hours to perform and could have been done in August when Interrogatory # 12 was received;

14. BSA, through Mr. Vesel, made no effort to gather information requested in Interrogatory # 12 as written; and

15. When he discovered the computer could provide data on all claims, but would not differentiate between volunteers, employees, and scouts, a choice was made not to provide any of the claims information.

{37} The trial court did not change its mind following Mr. Vesel's testimony, and we perceive no reason to disagree with the trial court. We hold that the trial court did not abuse its discretion in imposing sanctions against BSA, nor in imposing the specific sanctions it did.

{38} First, it is clear from the record that BSA did not provide timely responses to Plaintiff's discovery. To dispute the lack of timeliness is merely to cavil. The interrogatories and requests for production in dispute were served in August and September 1995. Eight months later in May 1996, on the eve of trial, there were still significant portions of the discovery responses dealing with the central issues in the case against BSA which were incomplete. This time frame is unreasonable from any standpoint, even taking into account the practical difficulties and vicissitudes of the practice of law today. The delays cannot be attributed to any failure of the trial court to deal with objections. The great majority of BSA's objections were dealt with and resolved against it at the

pretrial conference in October 1995. The remaining few were dealt with and resolved against BSA at the next pretrial conference in early March 1996. And, BSA never posed any objection to interrogatory 12. BSA's delay in providing discovery adversely affected Plaintiff's ability to adequately depose BSA's witnesses and representatives. For example, after a three-month delay in resuming the deposition of BSA's designated Rule 1-030(B)(7) NMRA 1998 witness, BSA appeared with no new documents at all, thereby forcing yet another delay and eventually requiring that other BSA personnel be deposed.

{39} Second, we find no reason to disagree with the trial court's decision that BSA's response to certain discovery was inadequate. Although BSA argues it actually provided reasonable, if partial, production and that any shortcomings were not material, we agree with the trial court that, given the course of discovery in this case, BSA's responses were both inadequate and inaccurate, and that the shortcomings were material. In particular, Plaintiff demonstrated that BSA failed to adequately respond to long set request numbers 9, 10, 11, 12, 14, and 24, as well as short set request numbers 5, 6, and 9, and interrogatory 12. The formal responses

provided five months after the hearing on Plaintiff's first motion to compel were clearly inadequate.[1] The formal responses were at least partially inaccurate since Plaintiff was able to independently uncover some documents responsive to long set number 11, and BSA later provided other documents when their existence was revealed during the deposition of BSA employees. BSA simply never answered long set requests numbers 9 and 10. Finally, their responses did not identify what materials were responsive to them, and did not state that there were no other documents which were responsive. In combination, these shortcomings in BSA's responses make them inadequate.

{40} Perhaps the most egregious example of inadequacy was BSA's failure to respond to interrogatory 12. As we outlined above, Plaintiff clearly demonstrated that BSA made essentially no effort to gather the information requested in interrogatory 12. Even the information provided as to New Mexico was grossly inadequate. The information requested was relevant to show BSA's prior experience with and knowledge of tree felling injuries. Prior knowledge of tree felling injuries would be relevant to BSA's notice of the dangers posed by large dead trees. We understand BSA's position

1. *Response to Request for Production (1-37)*
COMES NOW the defendant Boy Scouts of America, and for a Response to plaintiffs' Request for Production (1-37), states:
1. The national charter and bylaws have been provided.
2. The charter and bylaws of the Conquistador Council have been provided. BSA has no information regarding NM BSA Inc.
3. The organizational documents defining the relationship of BSA and the local council and regional areas have been provided. There are no directives. The BSA manuals and handbook have been provided. There are regular communications but no other documents relating to the organization of councils or troops.
4. The 1992 Handbook has been provided.
5. The 1992 Library of literature has already been supplied.
6. There are no documents responsive to this request. The documents on woodcutting have been provided.
7. The documents have been provided.
8. The annual reports have been provided.
9. The Court sustained BSA's objection to this request.
10. The Court sustained BSA's objection to this request.

11. There are no documents regarding use of volunteers to cut down trees. There are no specific documents regarding training or supervision of volunteers.
12-14. No additional response required.
15. The memorandum regarding coverage already supplied is complete.
16-18. The policies have been provided. As explained in Keith Gallaway's deposition, the policies are purchased by BSA nationally, but each council is assessed a pro rata share based on claims experience and other factors.
19. The correspondence confirming coverage has been provided.
20. There are no BSA documents responsive to this request.
21-22. No additional response required.
23. There are no documents responsive to this request. The decision regarding cutting down trees at a local camp is made locally.
24-28. No additional response required.
29. All of Garland's materials have been supplied.
30-34. No additional response required.
35-36. The organizational chart has been provided.
37. No additional response indicated.

to be that this interrogatory was fully answered when its director of risk management asserted she had found no tree felling injuries. However, we also believe this assertion could be viewed with some skepticism—as it was by the trial court—in the absence of an opportunity to at least test BSA's computer data banks and review some of its paper files.

{41} We have considered, and we reject, BSA's position that its failure to respond to interrogatory 12 cannot be used to support sanctions because it was never ordered to respond. BSA's argument fundamentally misperceives the nature of a litigant's obligation to respond to discovery requests and the court's discretionary power to enforce those obligations. It was BSA's responsibility to respond to interrogatories served on it, or to object to them. *See* Rule 1–033(A) NMRA 1998. BSA did neither as to interrogatory 12. Rule 1–037(D)(2) NMRA 1998 provides:

> **D. Failure of party to attend at own deposition or serve answers to interrogatories or respond to request for inspection.** If a party or an officer, director or managing agent of a party or a person designated under Rule 1–030 or 1–031 to testify on behalf of a party fails:
>
> . . . .
>
> (2) to serve answers or objections to interrogatories submitted under Rule 1–033, after proper service of the interrogatories; . . .
>
> the court in which the action is pending on motion may make such orders in regard to the failure as are just, and among others it may take any action authorized under Subparagraphs (a), (b) and (c) of Subparagraph (2) of Paragraph B of this rule.

Thus, the trial courts have the power to impose a sanction without first ordering compliance under Rule 1–037(A).

{42} BSA's argument is reminiscent of General Atomic Company's (GAC) argument in *United Nuclear Corp.,* that it "should not be penalized for its unilateral construction of the interrogatories because United did not complain about GAC's failure to provide information … until September 1976." 96 N.M. at 212, 629 P.2d at 288. As described by Mr. Vesel, BSA's strategy in responding

to discovery was similar to GAC's. Our Supreme Court's response to GAC's argument is apropos. It was BSA's duty to object to the interrogatory, not Plaintiff's to object to BSA's failures. And, Plaintiff's delay, if any, in seeking relief from the Court does not constitute a waiver of any claim that BSA's answers were inadequate. *See id.* at 216, 629 P.2d at 292.

{43} In a similar vein, BSA's approach to discovery was improper. Mr. Vesel described BSA's approach frankly when he agreed that BSA routinely seeks to limit the scope of discovery. While acknowledging that BSA could not unilaterally limit its responses, the process Mr. Vesel described, and the pattern of too often producing material only after Plaintiff demonstrated his knowledge of its existence, support a conclusion that BSA made "its own unilateral legal determination of the propriety of the questions asked." *Id.* at 211, 629 P.2d at 287. As our Supreme Court noted in *United Nuclear Corp.,* "[t]his practice is universally condemned." *Id.*

{44} BSA also argues that the sanctions were improper because the trial court never made any express findings that BSA's failure to comply with discovery was "willful and in bad faith." It is accurate that the trial court did not enter written findings and conclusions. We do not believe this failure is significant here, however. The trial court gave BSA the opportunity to file written requested findings of fact and conclusions of law. BSA did not avail itself of the opportunity and therefore waived any objection it might have had with regard to entry of findings. *See Fenner v. Fenner,* 106 N.M. 36, 41, 738 P.2d 908, 913 (Ct.App.1987) (a party who does not tender specific findings of fact waives review of the findings on appeal). In addition, the trial court twice explained the basis for its ruling, making clear it thought BSA chose its course of action, that BSA acted with volition and that its failings in providing discovery were not mere accidents.

{45} In its initial ruling quoted above, the trial court clearly found a pattern of continuing discovery abuse by BSA in violation of court orders. The next day, dur-

ing the hearing on BSA's request for reconsideration, the trial court gave a short outline of the discovery abuse arguments and then stated:

Why don't you let me explain the reasons which I typically don't do, but I will in this case. . . . We've had a series of hearings concerning whether or not the Boy Scouts had to give Plaintiffs information concerning the issue of control over what was done at Wehinahpay or other scouting activities. . . . In order to get to that issue, they asked a series of questions about safety policies, prior injuries, who did what to who, sort of thing to contact other people, discovery stuff as we understand the rules of discovery. It's either relevant or it could lead to relevant information. As recently as yesterday, I was told, and I remember hearing these questions before, discussed and (inaudible). Mr. Bobbitt tells me that last Thursday he found a pamphlet that has a procedure for what you do when there is a serious injury or a fatality to a scout or scouting person, whether it's an employee or volunteer on Scout property and suggests the form of telegram to send and tells who to send it to at the appropriate office at the Boy Scout National headquarters. . . . That was the subject of an inquiry, a fairly specific inquiry that was addressed several times by Mr. Bobbitt and in our discussions with Mr. Klecan because it was the type of stuff they received. At our initial hearings, Mr. Klecan indicated to me, well it would be difficult to find a lot of this stuff because they had to search file by file. Then we had another hearing (inaudible) well they got computer (inaudible) and then I'm told by Mr. Bobbitt well they asked about serious injuries and they're told no they can't find serious injuries, later they find out well we can tell you about severe injuries. One of their inquiries is about other injuries to other people in New Mexico. It turns out Mr. Klecan has defended many of those cases, perhaps all of them. Was that provided, (inaudible) with the names of the plaintiff's lawyers, plaintiffs, so that they could make any (inaudible) could find out about. Was it provided? No. What I conclude over this pattern and I don't

think this is all Mr. Klecan's fault. . . . I don't think that most of this is his fault. I think a good significant part of it is his client's fault. . . . The conclusion that I reach is the Boy Scouts didn't want to answer these questions for reasons that I don't quite yet understand, chose not to, obfuscated the issue, made it difficult to get the information and they, maybe that's not strong enough. They just didn't provide it. . . . The conclusion that I have reached and (inaudible) at this is that for reasons that I don't quite understand they chose not to provide the information. . . . What they've done is make this just as difficult as possible and then here we are, the morning of the trial, and information is still being provided after, what a second or third motion to compel. I've made (inaudible) told people what to do and it is still not timely provided and here you are at trial. Here we are at a trial where information which might have lead to relevant discoverable information isn't yet available and it isn't yet available because the defendant (inaudible) time. . . . The only sanction in this case that I felt I was left with was to strike the Boy Scouts of America defenses concerning the answer concerning control of the actions of Mr. Cochran and the Conquistador Council. That's why I made that decision. Now what would you like to tell me?

This statement by the trial court clearly indicates a finding that BSA acted willfully; that is, consciously or intentionally, as opposed to accidentally or involuntarily. *See Allred v. Board of Regents of the Univ. of N.M.*, 1997–NMCA–070, ¶¶ 27–31, 123 N.M. 545, 943 P.2d 579; *Kalosha v. Novick*, 77 N.M. 627, 630–31, 426 P.2d 598, 600 (1967). There is sufficient evidence in the record to support the trial court's view, and we find no abuse of discretion. To the extent BSA is arguing that there must be a finding of wrongful intent in order to impose sanctions, it is simply incorrect. *See Gonzales*, 120 N.M. at 158, 899 P.2d at 601.

{46} Finally, BSA argues that the sanctions are simply too harsh. BSA asserts that all of its affirmative defenses were struck. This too is incorrect. The trial court struck

only those affirmative defenses that depended to some degree on the issue of BSA's control of or responsibility for local activities. These were its fifth, sixth, and seventh affirmative defenses. Its other defenses, including its denial of any negligent conduct, lack of causation and comparative negligence theories survived and were at least partially successful. The trial court apparently viewed the discovery problems as involving factual issues surrounding the relationship between BSA, the Council, and local volunteers. The sanction was thus designed to prevent BSA from arguing that Plaintiff had failed to prove that BSA exerted—or had the power to exert—enough influence over local activities such as camp clean-up and tree felling to create a duty in BSA to act to address the safe conduct of those activities. This was a rational and reasonable approach to the problem found by the trial court. The sanction prevented BSA from making an argument which Plaintiff might not be able to meet because BSA had potentially not disclosed what Plaintiff needed to counter the argument. *See Sandoval v. Martinez,* 109 N.M. 5, 11, 780 P.2d 1152, 1158 (Ct.App.1989) (the imposition of sanctions should be guided by the extent to which the purpose of discovery—to aid in the preparation for trial—has been obstructed).

{47} As proof of the undue severity of the sanction, BSA argues that it was "inconsistent" and "incongruous" to strike its sixth affirmative defense to the extent it asserted that BSA did not franchise or control the Council, or if it did, it should be immune under the WCA. BSA does not explain how its approach to defending the case before the jury would have been different if it had been able to assert this defense. In fact, the entire thrust of its defense throughout this case has been to deny any right, ability, or duty to influence activities taken at the local level. In the absence of some showing that BSA intended to, or could have made a showing that Plaintiff was its employee for purposes of the WCA, the trial court's striking of the sixth affirmative defense was not an abuse of discretion. We address BSA's argument relating to its alleged immunity under the WCA later in this opinion.

{48} Finally, the trial court explicitly considered other lesser alternatives and found them wanting. The trial court's rejection of lesser alternatives is not in and of itself a basis for finding an abuse of discretion. Trial courts are not required to exhaust lesser sanctions before acting. *See Gonzales,* 120 N.M. at 158, 899 P.2d at 601; *United Nuclear Corp.,* 96 N.M. at 239, 629 P.2d at 315. In determining the nature of the sanctions to be imposed, the trial court must balance the nature of the offense, the potential prejudice to the parties, the effectiveness of the sanction, and the imperative that the integrity of the court's orders and the judicial process must be protected. *See id.* Given the circumstances facing the trial court, with the jury chosen in a case already four years old, and a course of behavior indicating willfulness in the face of the court's admonitions to conduct discovery in good-faith or face sanctions, we will not second-guess the trial court's decision here. At bottom, we are convinced BSA was not deprived of a fair trial under the circumstances.

## II. *Amendment of the Complaint to Conform to the Evidence*

{49} BSA asserts the trial court improperly granted Plaintiff's motion to amend his second amended complaint to conform to the evidence. The issue arose after the close of evidence during the jury instruction settlement conference. As requested by Plaintiff, instructions 1, 1A, and 17 included mention of Council employees in addition to volunteers as being potentially subject to BSA control or direction. BSA objected, arguing that Plaintiff had not alleged a theory of liability against it grounded on the acts or omissions of the Council or its employees. After much argument concerning the import of the second amended complaint and the instructions, including whether they stated vicarious or direct liability theories, the trial court granted Plaintiff's motion to amend.

{50} We affirm the trial court. We hold that the second amended complaint contained allegations reaching the Council and its employees, and therefore no amendment was necessary. In any event, the inclusion of the Council and its employees in the

212

jury instructions could not have come as any surprise to BSA and it was not prejudiced by the court's ruling.

▪ {51} We start our analysis, appropriately enough, with the second amended complaint itself. Count II, "Negligence Against BSA" in its entirety alleged:

All previous paragraphs are incorporated herein by reference.

34. BSA through its franchise to the Conquistador Council, maintained the right to control and direct the activities of volunteers like Larry Cochran.

35. BSA maintained the right to create policies and procedures to ensure the safety of council employees like Ernie Enriquez, while engaged in outdoor activities like felling trees.

36. At the time Ernie Enriquez was injured, volunteer Larry Cochran was engaged in an activity that was either done at the behest of or inured to the benefit of BSA[.]

37. Upon information and belief, BSA was aware of other accidents nationwide, in which boy scouts, volunteers or council employees were injured by falling trees, while felling trees, or while inappropriately using chain saws, axes or other equipment to remove or fell trees.

38. BSA recognized the ultrahazardous nature and inherent danger involved in removing or felling trees, through its policy prohibiting scouts from participating in this activity. Despite this recognition, BSA did not provide adequate training, policies or procedures for untrained adult volunteers who were requested to perform this activity.

39. BSA acted negligently, with gross negligence or recklessly, in one or more of the following ways:

A. Failing to establish a policy prohibiting untrained volunteers from performing the ultrahazardous activity of felling dead trees.

B. Failing to require or provide adequate training for volunteers asked to participate in felling trees; or

C. Failing to provide adequate information to volunteers concerning the safe and proper way to fell dead trees.

40. In addition to its own negligence, BSA is responsible for all of the negligent acts or omissions of volunteer Larry Cochran who was their agent, their agent by estoppel, through his apparent agency or through franchise-franchisor liability.

41. As a direct and proximate result of the acts or omissions of BSA or Defendant Cochran, Ernie Enriquez suffered those damages set out in paragraphs 32 and 33, which are incorporated herein by reference.

WHEREFORE, plaintiff Ernie Enriquez requests this court enter judgment in his favor against defendant BSA for compensatory and punitive damages in an amount to be determined at trial, prejudgment and post-judgment interest, costs incurred in this lawsuit and for other relief which the court may deem appropriate.

BSA refers only to paragraph 40 of the second amended complaint to support its position. It is a common-place principle, however, that pleadings must be read in their entirety. *See Schmitz v. Smentowski,* 109 N.M. 386, 389–90, 785 P.2d 726, 729–730 (1990) ("[N]otice pleading does not require that every theory be denominated in the pleadings—general allegations of conduct are sufficient, as long as they show that the party is entitled to relief and the averments are set forth with sufficient detail so that the parties and the court will have a fair idea of the action about which the party is complaining and can see the basis for relief."). We believe paragraphs 34 and 35 would place the ordinarily careful reader on notice that a claim is being made on the basis of Council acts and omissions. In addition, paragraphs 6, 9, 10, 19, and 20 of the Complaint also suggest that Plaintiff was depending on Council involvement to assert his claims.

{52} Perhaps the best evidence of our reading of the second amended complaint is contained in BSA's own answer. Its direct response to paragraph 38 of the Complaint states:

The allegations of paragraph 38 are argumentative in that they contain assumptions which are incorrect. Boy Scouts of America denies that the activity was ultrahazardous or inherently dangerous and denies that its chartering of a local council involved training, policies or procedures for this activity. Therefore, the allegations of paragraph 38 are denied.

Most pertinent, however, is BSA's sixth affirmative defense, quoted above. BSA must have perceived a claim against it based on Council acts or omissions, otherwise why highlight this specific defense and BSA's lack of control over Council activities—which after all, are carried out by Council employees? Further, the sixth affirmative defense is the functional counterpart to the seventh affirmative defense in which BSA similarly denies that any conduct of the Defendant Cochran, a volunteer, is attributable to it.

{53} Thus, we conclude that BSA carefully and appropriately read the allegations against it, and, concluding that liability was asserted based on Council conduct, properly stated its defense. There was no need to amend to conform to the evidence.

{54} Any lingering doubt on the matter, however, we will resolve in favor of the trial court's action, which we review under the abuse of discretion standard. *See Schmitz*, 109 N.M. at 390, 785 P.2d at 730.

{55} Rule 1–015(B) NMRA 1998 provides in pertinent part:

> **B. Amendments to conform to the evidence.** When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

The import of the rule is to require trial courts to allow amendment of pleadings when the predicate showing of consent to trial is made. The predicate determination is left to the trial court and is also subject to the abuse of discretion standard of review. *See Schmitz*, 109 N.M. at 390, 785 P.2d at 730.

{56} BSA argues to the contrary, but provides no authority, other than the general case law describing the circumstances under which consent may or may not be found. *See Branch v. Mays*, 89 N.M. 536, 538–39, 554 P.2d 1297, 1299–1300 (Ct.App.1976). Here, we believe the trial court could find consent. The trial court's first reaction to BSA's objection to Plaintiff's jury instruction was that it was a fair statement of Plaintiff's claims, and then it observed: "And, I don't think you're surprised by it, are you?"

{57} After argument, the trial court found that the issue of BSA liability or responsibility through the Council and its employees had been tried with the implied consent of the parties. The discussion leading to this holding began with a review by the parties of the second amended complaint but actually centered on the course of the litigation after close of the pleadings, including: (1) the fact that Plaintiff's discovery requests throughout addressed BSA's relationship with local councils and their employees; (2) certain pretrial motions and Plaintiff's trial brief addressed the issue of the Council and Council employees and their relationships to BSA; and (3) the Plaintiff's proposed jury instructions were submitted two weeks before trial and BSA posed no objections along the lines being argued at that point. In fact, the first time BSA made any objection at all to inclusion of the Council and its employees in the case was after the evidence had been received.

{58} These circumstances, along with the fact that the trial court had ordered as part of its sanctions, without this objection being raised by BSA, that control of Cochran and of the Council would be determined for purposes of trial, support the view that BSA tried the issue with implied consent.

{59} Even in the absence of consent, however, the trial court may allow an amendment to conform to the evidence if it feels that the objecting party has not been prejudiced. *See id.* at 390–91, 785 P.2d at 730–31; *see also* Rule 1–015(B) ("If evidence is ob-

jected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits."); *Whitfield Tank Lines, Inc. v. Navajo Freight Lines, Inc.,* 90 N.M. 454, 461, 564 P.2d 1336, 1343 (Ct.App.1977) (defendant made no showing of actual prejudice which would justify a denial of plaintiff's motion to amend the complaint to conform to the evidence); *Camp v. Bernalillo County Med. Ctr.,* 96 N.M. 611, 613, 633 P.2d 719, 721 (Ct.App.1981) (in determining whether the opposing party would be prejudiced if the amendment were allowed, the court looks at various factors such as "whether (the defendant) had a fair opportunity to defend and whether he could offer any additional evidence if the case were to be retried on a different theory."). Because BSA knew of Plaintiff's claims through his discovery requests, pretrial motions, trial brief, and requested jury instructions, we cannot conclude that BSA did not have a fair opportunity to defend. Thus, we conclude that BSA was not prejudiced by the trial court's order. As such, we cannot, and do not, find any abuse of discretion by the trial court.

### III. *BSA As a Statutory Employer*

{60} BSA argues it was Plaintiff's statutory employer and entitled to immunity from tort liability under the exclusivity provisions of the WCA. *See* § 52–1–9. BSA makes an *ipso facto* argument which proceeds as follows: The trial court ruled as part of the discovery sanction that BSA could not contest that it controlled the Council. The trial court instructed the jury that BSA could be liable for the tree cutting activities of the Council. The trial court directed as a matter of law that BSA controlled the details of tree cutting by the Council. Therefore, BSA concludes, it was Plaintiff's statutory employer as a matter of necessity and logical conclusion.

{61} We do not agree that the trial court ever directed "as a matter of law that BSA controlled the details" of tree cutting by the Council. BSA provides no citation to the record in support of this assertion, and we do not believe the sanction can be made to bear this characterization. Thus, one part of BSA's syllogism fails. More fundamentally, however, BSA's argument depends on an incorrect view of statutory employer law in New Mexico.

{62} BSA's argument assumes that any finding of control sufficient to merit imposition of a duty of care upon it is also sufficient to automatically make it a statutory employer. New Mexico law does not support such an analysis. *Harger v. Structural Servs., Inc.,* 1996–NMSC–018, 121 N.M. 657, 661–64, 916 P.2d 1324, 1328–31, describes a multi-factor analysis based on the Restatement (Second) of Agency § 220(1) (1958) designed to determine the level and nature of control exerted by a putative statutory employer over persons and entities doing work for it. Applying these factors on a case-by-case basis, the courts determine whether the relationship is best characterized as one of independent contractor or employer and employee. If it is the latter, the defendant may claim the protection of the WCA as a statutory employer. *See id.* at 664–66, 916 P.2d at 1331–33. This analysis does not lend itself to the black and white approach that is the foundation of BSA's theory.

{63} Rather, consideration of the character of the control exercised by one actor over another in particular cases implies a spectrum of grays along a continuum from no control and no duty to a level of control sufficient to appropriately say one actor is the employer of the other. *Harger* implicitly recognized this continuum when it concluded: "Our determination that Jaynes lacked the right to exercise essential control over Superior does not preclude a finding that Jaynes retained a sufficient level of control to create a duty of reasonable care to Superior's employees." 121 N.M. at 670, 916 P.2d at 1337; *see Martin v. Venice Hosp.,* 603 So.2d 1377, 1379 (Fla.Dist.Ct.App.1992) (control sufficient to implicate tort liability not necessarily equivalent to control imposing worker's com-

pensation liability); *DeArman v. Popps,* 75 N.M. 39, 43–46, 400 P.2d 215, 217–18 (1965) (rejecting assertion that any duty based on contractor's control would, as a matter of law, make worker's compensation the exclusive remedy); *see also* Restatement (Second) of Torts § 414 cmt. a (1986) (hereinafter Restatement).

{64} Finally, BSA provides no factual basis for its argument. BSA apparently presented no evidence to the trial court, even as an offer of proof, to establish that its relationship with the Council and Plaintiff should be deemed subject to the WCA. Without any factual basis, BSA's argument must fail.

**IV.** *Jury Instructions*

{65} Plaintiff requested, and the trial court gave, the following "theory of the case" instructions:

#### INSTRUCTION NO. 1

In this civil action the plaintiffs seek compensation from the defendants for damages which plaintiffs claim were proximately caused by:

a. BSA's negligent policies and practices in allowing untrained volunteers and council employees to do the inherently dangerous activity of felling large, dead trees;

b. BSA's negligent failure to provide or require adequate training or safety instruction before allowing volunteers or council employees to engage in the inherently dangerous activity of felling large, dead trees;

c. Negligence of Larry Cochran in use of his winch truck during the tree felling operation.

#### INSTRUCTION NO. 1a

1) To establish the claim of negligent policies and practices against BSA, the plaintiffs have the burden of proving at least one of the following contentions applicable to BSA:

a. BSA negligently failed to have a policy which required the use of trained tree cutting professionals for the inherently dangerous activity of felling large, dead trees;

b. BSA failed to require adequate training of volunteers and council employees before they were engaged in the inherently dangerous activity of felling large, dead trees.

The plaintiffs also contend and have the burden of proving, that such negligent policies and practices were a proximate cause of the injuries and damages.

2) To establish the claim of negligence on the part of Larry Cochran, the plaintiffs have the burden of proving at least one of the following contentions applicable to Mr. Cochran:

a. He negligently used his winch truck and cable during this tree-felling operation.

The plaintiffs also contend and have the burden of proving that such negligence by Larry Cochran was a proximate cause of the injuries and damages.

#### INSTRUCTION NO. 17

BSA may be liable for the acts of volunteers or council employees if you find that BSA:

1. Had the right to forbid the cutting of large, dead trees by volunteers or council employees, or

2. Had the right to require training before volunteers or council employees were permitted to cut down large dead trees.

{66} BSA submitted, and the trial court refused, alternative language for the theory of the case instructions describing proximate cause as a two-step analysis. BSA's alternative concept was requested in two separate instructions using slightly different but substantively equivalent verbiage. We quote only one.

#### DEFENDANT BOY SCOUTS OF AMERICA'S REQUESTED INSTRUCTION NO. ＿＿＿＿

To establish the claim of negligent policies and practices against BSA, the plaintiffs also have the burden of proving that, as a result of the failure to have a policy

requiring the use of a tree cutting professional or failure to require adequate training, a volunteer or council employee was negligent, and that the negligence of that volunteer or council employee was a proximate cause of the injuries or damages.

In addition, BSA requested, and the trial court refused, the following instructions describing alternative vicarious liability theories:

### DEFENDANT'S INSTRUCTIONS *NOT* AGREED UPON BY THE PARTIES NO. B

An agent is a person who, by agreement with another called the principal, represents the principal in dealings with third persons or transacts some other business, manages some affair or does some service for the principal, with or without compensation. The agreement may be oral or written.

### DEFENDANT'S INSTRUCTIONS *NOT* AGREED UPON BY THE PARTIES NO. C

If you find there was a principal and agent relationship, the principal is liable for the acts of its agent when:

1. The agent was acting within the scope of its agency; and

2. The principal had the right to control the manner in which the details of the work were to be performed at the time of the occurrence, even though the right of control may not have been exercised.

### DEFENDANT'S REQUESTED INSTRUCTION NO. E

A franchisor has the right to set standards, the right to regulate the activity, and the right to inspect for compliance. For a franchisor to be liable as the principal for the acts of the agents, the franchisor must have the right to control the day to day operations of the franchisee.

{67} BSA argues the verdict must be reversed for two reasons flowing from the jury instructions. First, BSA asserts the instructions did not properly instruct on proximate cause because they did not require the jury to find that BSA's fault had to cause the negligence of Council volunteers or employees which in turn caused Plaintiff's injuries. Second, BSA asserts that without its requested instructions nos. B, C, and E there was no proper description of the elements of Plaintiff's respondeat superior or franchisor/franchisee theories of liability. BSA argues its requested and refused instructions were necessary to explain its theories.

{68} BSA's first and primary objection centers on the issue of proximate cause. BSA asserts that under Plaintiff's direct liability theory it could be liable only if its negligence caused Council employees and volunteers to be negligent, and their negligence in turn caused Plaintiff's injuries. BSA argues that this chain of causation had to be included in the instructions explicitly. Its alternative theory of the case instructions did so.

{69} The trial court did not err in refusing BSA's alternative instructions. In reviewing any assertion of error in instructions, we are constrained to view the instructions in their entirety. It is sufficient if the instructions as a whole provided an accurate statement of the applicable legal framework and issues. *See McCarson v. Foreman,* 102 N.M. 151, 158, 692 P.2d 537, 544 (Ct.App.1984). Here, the trial court gave the general proximate cause instruction, UJI 13–305 NMRA 1998. This instruction directs the jury to decide whether a defendant's acts produced the plaintiff's injury. The instruction assumes juries will be dealing with situations involving a series of events, and it contains provisions addressing such cases. UJI 13–305 is designed to give the jury guidance in determining whether and when to break the causative chain, depending on the factual circumstances before it. A special instruction highlighting one link in any chain is not necessary. *See* UJI 13–305 (defining proximate cause); *cf. Armstrong v. Industrial Elec. & Equip. Serv.,* 97 N.M. 272, 275, 639 P.2d 81, 84 (Ct.App.1981) (instructions given on proximate cause, in combination with the directives in the special

interrogatories, were sufficient to adequately apprise the jury as to the definition of proximate cause); *Cf. Mireles v. Broderick,* 113 N.M. 459, 461–62, 827 P.2d 847, 849–50 (Ct. App.1992) (party relying on circumstantial evidence is not ordinarily entitled to instructions specifically describing chain of inference upon which party relies).

{70} Further, the trial court gave UJI 13–306 NMRA 1998, defining an independent intervening cause. Given BSA's theory of the case, this instruction provided the jury a full panoply of proximate cause alternatives available to decide whether BSA's acts or omissions played a proximate role in causing Plaintiff's injury. The instructions with regard to proximate cause were sufficient.

{71} The second of BSA's objections is relatively easily answered. As BSA notes, a party is entitled to an instruction on his theory of the case if there is evidence to support it. *See Yardman v. San Juan Downs, Inc.,* 120 N.M. 751, 756, 906 P.2d 742, 747 (Ct.App.1995). However, this principle normally only applies to that party's theories. While all parties may participate in ensuring that instructions given are accurate and complete, a defendant cannot require that an instruction on a particular theory of liability be given over plaintiff's objections. Similarly, a plaintiff cannot require that a defense theory instruction be given when the defendant does not desire it. For example, in a products liability case, a plaintiff may originally plead theories of negligent manufacture, failure to properly warn, and strict liability, among others. If at trial plaintiff chooses to abandon all but the negligence theory, the defendant cannot insist that the other theories of liability be instructed upon so it can defend against them. A defendant cannot force the plaintiff to accept the burden of proving theories upon which he does not wish to rely. That is what BSA was essentially doing when it submitted its instructions B, C, and E.

{72} BSA's instructions B and C are derived from UJIs 13–401 and 13–402 NMRA 1998. They describe a rule of respondeat superior liability based on traditional principal/agent rules. BSA's instruction E describes a franchisor/franchisee theory of

liability. While there is some question whether this instruction accurately reflects New Mexico law, we need not decide that issue here. It is enough to observe that these were not theories Plaintiff chose to pursue or argue to the jury. Plaintiff chose to rely on a theory of direct liability based on BSA's failure to prevent untrained persons from felling large trees, or in the alternative, its failure to provide or require adequate training for persons like Plaintiff.

{73} More pointedly in this case, BSA's instructions B, C, and E were not required because of the discovery sanction. As we have noted, part of the sanction was a finding by the trial court of sufficient control by BSA over local activities to impose a duty of care on it. Each of BSA's requested instructions poses control as an aspect of the theory it embodies. Giving the instructions would have imposed on Plaintiff the burden, once again, of proving an element he was no longer required to prove.

**V.** *Admission of Evidence*

{74} The trial court allowed Plaintiff to introduce evidence concerning the use of hard hats during tree felling and evidence of a tree felling injury which occurred in Arizona in 1995. BSA asserts this evidence was so prejudicial that it requires a new trial. We review the trial court's actions under the abuse of discretion standard. *See Baerwald v. Flores,* 1997–NMCA–002, ¶ 20, 122 N.M. 679, 930 P.2d 816.

{75} The evidence regarding hard hats was introduced through Plaintiff's tree felling expert. The expert stated that hard hats should be worn as safety equipment for operations of this kind, and he further stated he wore a hard hat when felling large trees. BSA argues that this testimony was not relevant because it did not go to the issue of the proximate cause of the accident, or to why the tree broke. BSA asserts the hard hat evidence went only to the severity of the injury, which was not contested at trial. Plaintiff responds that evidence of the hard hat was relevant to show BSA's "cavalier" attitude toward the safety of volunteers and Council employees involved in felling large

dead trees. While we do not adopt Plaintiff's characterization of BSA's attitude, we do agree that evidence of hard hat use was relevant to provide information to the jury concerning minimal safety precautions that could be taken when cutting down large trees. The fact that BSA did not address even these minimal precautions was relevant to the issue of BSA's failure to require or provide adequate training. Thus, it was not an abuse of discretion for the court to admit this evidence.

{76} The testimony concerning the 1995 tree felling injury came in through BSA's representative at the trial, Keith Gallaway, an area director for BSA. On cross-examination, Mr. Gallaway testified he was unaware of any tree felling accident other than Plaintiff's. On redirect, Plaintiff asked Mr. Gallaway if he knew of the 1995 accident in Arizona, and Mr. Gallaway testified he was not aware of it. Plaintiff continued to question Mr. Gallaway from the contents of an Arizona newspaper article about the accident. Plaintiff pointed out that the regional office for Mr. Gallaway's region is located in Tempe, Arizona, although Mr. Gallaway asserted he lived in Littleton, Colorado and spent little time in the Tempe office.

{77} We hold that the initial questions concerning Mr. Gallaway's awareness of the 1995 accident were not improper given his testimony that he was not aware of other accidents similar to Plaintiff's. In the context of the cross-examination and redirect of Mr. Gallaway, we cannot say it was an abuse of discretion for the trial court to allow questions about the Arizona incident. The question asked of Mr. Gallaway by BSA's counsel included the time frame prior and subsequent to Plaintiff's injury, and Plaintiff's cross-examination was a fair effort to impeach Mr. Gallaway's testimony. *See Mac Tyres, Inc. v. Vigil,* 92 N.M. 446, 448–49, 589 P.2d 1037, 1039–40 (1979). The trial court properly allowed and limited counsel's examination.

{78} Moreover, the trial court properly limited introduction of evidence concerning this accident when it disallowed introduction of the newspaper article. It did, however, allow admission of a Gila County Sheriff's Department official report on the accident as an official public record or report pursuant to Rule 11–803(H) NMRA 1998. Before the jurors were allowed to view the exhibit, the trial judge provided an appropriate cautionary instruction telling the jury that the exhibit had been admitted for the sole purpose of impeaching the witness and that it was to be used and considered by the jury for no other reason. Accordingly, we hold the trial court did not abuse its discretion in admitting the report to verify the occurrence of the incident and as part of cross-examination. *Cf. State v. La Madrid,* 1997–NMCA–057, ¶ 7, 123 N.M. 463, 943 P.2d 110 (finding no abuse of discretion in trial court's decision not to admit document used in cross-examination to impeach witness).

## PLAINTIFF'S CROSS–APPEAL

### I. *Joint and Several Liability*

{79} The jury apportioned seventy-five percent of the fault for Plaintiff's injuries to BSA, fifteen percent to the Council, and ten percent to Plaintiff. Plaintiff submitted a form of judgment on the verdict which imposed joint and several liability on BSA for the Council's share of the total comparative fault. Plaintiff appeals the trial court's refusal to do so, asserting that *Saiz v. Belen School District,* 113 N.M. 387, 827 P.2d 102 (1992), requires imposition of joint and several liability. In addition, Plaintiff argues that joint and several liability is appropriate as a matter of public policy given the legal relationship between BSA and the Council. BSA argues that: (1) Plaintiff failed to plead or preserve the claims; (2) it did not engage in any inherently dangerous activity; (3) it has no special relationship with the Council; (4) it is not directly liable to Plaintiff; and (5) joint and several liability will result in double recovery to Plaintiff in violation of WCA. We resolve the preservation argument separately. The remaining arguments will be dealt with as a whole because they are so interrelated.

### A. Preservation

{80} BSA asserts Plaintiff failed to preserve his joint and several liability claim

because he did not plead strict liability, or request joint and several liability in his complaint, and because he did not request a *Saiz* special jury interrogatory. We disagree.

{81} The complaint against BSA has already been quoted and analyzed in this opinion. We provide the same liberal construction to the pleadings in this context. It is accurate that Plaintiff did not assert a strict liability claim, and did not explicitly request imposition of joint and several liability in his complaint. However, paragraphs 38 and 39 of the complaint clearly allege that tree felling is inherently dangerous or ultrahazardous. Given the prominence of *Saiz* and its progeny on the legal landscape in New Mexico, we believe that simple use of the words "inherent danger" is sufficient to alert the average attorney that joint and several liability may be sought. After all, one of the primary holdings of *Saiz* was that joint and several liability is the norm when precautions are not taken against inherent dangers and when the court finds there is a non-delegable duty of care. *See id.* at 400, 827 P.2d at 115.

{82} In addition, as in *Saiz*, the thrust of the complaint here was that BSA was responsible for everything that led up to Plaintiff's injury. This overriding theory is sufficient to put BSA on notice of a claim of joint and several liability. *See id.* at 401, 827 P.2d at 116. Like the school district in *Saiz*, BSA defended by asserting the comparative negligence of others. Plaintiff was entitled to respond to this defense at trial with a request for joint and several liability. *See id.*

{83} Finally, Plaintiff requested appropriate jury instructions concerning the necessity for appropriate precautions to meet the inherent danger. Plaintiff's requested instructions numbers 1 and 2, while not tracking precisely the current language of UJI 13–1634 NMRA 1998—which was not available at the time of trial—convey the essence of liability premised on the absence of reasonable precautions.[2] Plaintiff's requested

instructions were rejected by the trial court, and the instructions quoted above at paragraph 65, sounding in negligence, were given instead. The reasonable precautions Plaintiff argued for were adequate training and safety instruction, or a simple prohibition against allowing untrained persons to fell large trees.

{84} These concepts are reflected in 'the instructions given, with the added burden on Plaintiff requiring him to prove BSA's negligence. As a result, we perceive no prejudice to BSA in allowing Plaintiff to pursue a joint and several liability claim. In that regard, this case is similar to *Hinger v. Parker & Parsley Petroleum Co.*, 120 N.M. 430, 436–37, 902 P.2d 1033, 1039–40 (Ct.App.1995). There, the defendants asked this Court to review the verdict against them as if it were a *Saiz* strict liability verdict. We declined to do so because the case had been tried and instructed on negligence theories and the prejudice defendants were claiming from being subjected to *Saiz* liability was simply not present. *See id.* at 436–37, 902 P.2d at 1039–40.

### B. *Applicability of Joint and Several Liability*

{85} Prior to *Bartlett v. New Mexico Welding Supply, Inc.*, 98 N.M. 152, 646 P.2d 579 (Ct.App.1982), joint and several liability among concurrent tortfeasors was the norm in New Mexico. That is, where more than one actor's negligence was found to be the proximate cause of a person's injuries, each actor was potentially liable to the plaintiff for the full amount of damages found, rather than only the actor's proportionate share of fault. *Bartlett* adopted the notion of several liability without fully defining the term. Andrew G. Schultz & M.E. Occhialino, *Statutory Adoption of Several Liability in New Mexico: A Commentary and Quasi–Legislative History*, 18 N.M.L.Rev. 483, 485 (1988)

---

2. Instruction No. 1

This court has determined as a matter of law that the cutting of the large, dead tree in this case was an inherently dangerous activity for which BSA had a non-delegable duty to ensure that reasonably necessary precautions were taken to prevent injury.

Instruction No. 2

BSA is liable for injuries from an inherently dangerous activity if BSA failed to take reasonably necessary precautions in preventing injury from that inherently dangerous activity and if the absence of the necessary precaution was a proximate cause of the injury.

(hereafter Schultz & Occhialino). In 1987, the New Mexico Legislature enacted a statute incorporating the doctrine of several liability as the norm in New Mexico, but provided for exceptions. The statute states:

A. In any cause of action to which the doctrine of comparative fault applies, the doctrine imposing joint and several liability upon two or more wrongdoers whose conduct proximately caused an injury to any plaintiff is abolished except as otherwise provided hereafter. The liability of any such defendants shall be several.

B. In causes of action to which several liability applies, any defendant who establishes that the fault of another is a proximate cause of a plaintiff's injury shall be liable only for that portion of the total dollar amount awarded as damages to the plaintiff that is equal to the ratio of such defendant's fault to the total fault attributed to all persons, including plaintiffs, defendants and persons not party to the action.

C. The doctrine imposing joint and several liability shall apply:

(1) to any person or persons who acted with the intention of inflicting injury or damage;

(2) to any persons whose relationship to each other would make one person vicariously liable for the acts of the other, but only to that portion of the total liability attributed to those persons;

(3) to any persons strictly liable for the manufacture and sale of a defective product, but only to that portion of the total liability attributed to those persons; or

(4) to situations not covered by any of the foregoing and having a sound basis in public policy.

NMSA 1978, § 41–3A–1(A) through (C) (1987). It bears noting that the statute applies "[i]n any cause of action to which the doctrine of comparative fault applies." Section 41–3A–1(A). "Causes of action" should be distinguished from the broader notion of cases. Thus, the strictures of the statute may apply to some claims for relief and not others in the same case. See Schultz & Occhialino, supra, at 487. The narrow ques-

tion before us is whether Plaintiff's cause of action against BSA fits within any of the exceptions to the statute.

{86} Of the four exceptions, only two potentially apply. Plaintiff does not argue that BSA was an intentional wrongdoer, and, of course, this is not a products liability claim. See §§ 41–3A–1(C)(1) and (3). Of the remaining two, the vicarious liability exception does not apply either because the matter was tried only on a theory of direct liability against BSA. Defendants requested, and Plaintiff argued against, giving the jury UJIs 13–401 and 13–402, the only requested instructions describing principal/agent vicarious liability. Plaintiff's arguments were based on the impropriety of the broadness of the right to control language in the instructions, and on the fact that vicarious liability was not in keeping with his direct, liability theory. In addition, the trial court refused all requested jury instructions describing the vicarious liability of franchisors for the acts of their franchisees.

{87} Thus, the jury was not requested to determine whether BSA could or should be liable for the acts of Council employees regardless of any fault on the part of BSA. Rather, the jury instructions required the jury to determine if BSA was negligent in its own right, and if so, whether BSA's negligence was a proximate cause of Plaintiff's injuries. Since the verdict was not based on a traditional vicarious liability theory, it would be inappropriate to consider Section 41–3A–1(C)(2) as a basis for joint and several liability here. To the extent that Plaintiff's arguments analogizing BSA to a franchisor depend on vicarious liability concepts, we reject them as irrelevant in this context.

{88} We are left with the public policy exception of Section 41–3A–1(C)(4). Schultz and Occhialino observe that the language of this provision was designed to "assure that the courts will have the same flexibility to determine exceptions to several liability that they would possess if they were applying Bartlett rather than construing the language of Article 3(A)." 18 N.M.L.Rev. at 493. There are no specific limitations in the public policy exception itself which would restrict

the traditional common-law function of the courts in this area. We therefore analyze whether the exception should be applied here in light of the Several Liability Act, but we emphasize the courts' common-law rationale for developing and applying joint and several liability in tort law.

{89} In New Mexico, consideration of joint and several liability for injuries caused by inherently dangerous activities finds its genesis in *Saiz. Saiz* arose from an electrocution incident in which a student was killed. The electrocution occurred because a buried electrical cable had been damaged as a result of the original installer's failure to fit the cable with proper bushings, eventually leading to an electrical short. *See Saiz,* 113 N.M. at 392, 827 P.2d at 107. Because the statute of repose had run against the designers and installers of the system, suit could be brought only against the property owner, the school district. *See id.* In response to the school district's defense of the comparative fault of its contractors, the plaintiff in *Saiz* argued that the school district was responsible to third persons for harm caused by the negligence of its independent contractors because they were engaged in an inherently dangerous activity. The plaintiff in *Saiz* sought to impose joint and several liability under Section 41–3A–1(C)(2) for vicarious liability and under Section 41–3A–1(C)(4), the public policy exception to the statute. *Saiz,* 113 N.M. at 393, 827 P.2d at 108.

{90} Our Supreme Court undertook a comprehensive, and fresh, review of duty and liability in the context of inherently dangerous activities. One of its conclusions was: "Therefore, we hold that when precautions are not taken against inherent danger, the employer is jointly and severally liable for harm apportioned to any independent contractor for failure to take precautions reasonably necessary to prevent injury to third parties arising from the peculiar risk." *Saiz,* 113 N.M. at 400, 827 P.2d at 115. Thus, our Supreme Court has already made the fundamental decision that injuries arising from the conduct of inherently dangerous activities fit within the public policy exception to the statute. The question for us then becomes whether Plaintiff's cause of action against

BSA fits the *Saiz* paradigm, thus compelling imposition of joint and several liability. This requires us to examine the nature of *Saiz* liability.

{91} There are two aspects of *Saiz* which are at issue here. The first is the issue of inherent dangerousness; specifically, whether the felling of large dead trees can properly be deemed an inherently dangerous activity under the *Saiz* criteria. The second is whether the *Saiz* rationale can be applied to a factual situation not involving a property owner or other employer of an independent contractor.

{92} The trial court ruled that the felling of large dead trees is inherently dangerous, and BSA only half-heartedly challenges this ruling. However, given the difficulty of the area, and the recognized failure of the cases to provide a cogent, predictable test for inherent danger, we deem it advisable to discuss the issue at length.

{93} In *Saiz,* our Supreme Court referred to the Restatement Sections 413, 416, and 427 to define "inherently dangerous" and its synonym "peculiar risk." *Saiz,* 113 N.M. at 394, 827 P.2d at 109. Inherent danger will be found if an activity, or the manner in which an activity is necessarily conducted, poses an unusual and high risk of harm to those involved in the activity or to other persons encountering the activity or its results. *See id.* at 396, 827 P.2d at 111; Restatement §§ 413 cmt. b, 416 cmt. e, 427 cmt. b. The "unusual" prong of the definition addresses the relative rarity of the activity and the concomitant lack of contact or experience with the activity and its dangers by the general public. Thus, while driving an automobile may be considered by some as highly dangerous, it is a common, every-day occurrence, and the resultant familiarity of the populace with its dangers through personal experience dictates against any finding that its risks are peculiar. In this regard, it may be significant that the activity should be carried out by specially trained individuals. *See* Restatement § 427 cmt. c.

{94} Citing *Seal v. Carlsbad Indep. Sch. Dist.,* 116 N.M. 101, 860 P.2d 743 (1993), BSA argues under this prong that felling trees is like swimming and thus should not be

**222**

deemed to be inherently dangerous. We believe *Seal* is best explained as a recognition that swimming in pools like driving, is a common, everyday occurrence, and cannot reasonably be deemed to pose an unusual risk of harm.

{95} The second prong of the criteria involves evaluation of the probability of harm to be expected from the activity. As noted in *Saiz*, the risk of harm need not be certain, as could be said of ultrahazardous activities. 113 N.M. at 396, 827 P.2d at 111. But, there must be a high risk or probability of harm to participants or passersby in the absence of reasonable precautions. *See id.* Quantification of the degree of risk or relative probabilities of suffering harm is impossible in the abstract. It can only be done on a case-by-case basis with due regard for the severity of potential harm.

{96} In addition, courts should keep in mind that one of the policies behind the law of torts is the encouragement of reasonable safeguards against risk of harm. *Id.* at 398, 827 P.2d at 113. In *Huddleston v. Union Rural Elec. Ass'n*, 841 P.2d 282, 287 (Colo.1992) (en banc), the Supreme Court of Colorado, adopted the observation of the trial court stating: "[I]t is sound public policy with regard to inherently dangerous activity 'to have another layer of concern in order to try to ensure that activity that is inherently dangerous gets enough attention so that we reduce the number of people who are injured.'" As we have recognized, the normative purposes of tort law are adequately served in most cases by application of the ordinary rules of negligence. *See Gabaldon v.. Erisa Mortgage Co.*, 1997–NMCA–120, ¶ 15, 124 N.M. 296, 949 P.2d 1193, *certs. granted*, 124 N.M. 268, 949 P.2d 282. In cases of inherently dangerous activity, however, tort law's normative function is better served by the application of joint and several liability.

{97} The third prong of the *Saiz* criteria requires that the danger flow from the activity itself when carried out in its ordinary, expected way, such that reasonable precautions aimed at lessening the risk can be expected to have effect. *Saiz*, 113 N.M.

at 397, 827 P.2d at 112. The risk must be part of the activity. Damages caused by an actor's negligence in the operative details of the activity—such as failure to conduct routine maintenance on machinery used in conducting the activity—will not by themselves trigger liability, whether vicarious or direct, on the part of an employer of an independent contractor. *See id.*

{98} Applying these considerations to this case, we hold that the trial court was correct in its ruling that felling large dead trees such as the one that injured Plaintiff is an inherently dangerous activity. The record reveals basic agreement between Plaintiff's and Defendants' experts that felling large dead trees is dangerous. The danger flows from the size and weight of the trees, as well as the unpredictability of their behavior both while being cut and while actually falling. An additional indicator is the statistic that experienced loggers rank in the top three occupations for injuries incurred on the job. Given the severity of Plaintiff's injuries, the potential for serious injury is at least anecdotally great. The danger is sufficiently great, according to Plaintiff's tree cutting expert, that it comes close to fitting the definition of an ultrahazardous activity.

{99} Even BSA's representative, Mr. Gallaway, at trial acknowledged—albeit perhaps in an unguarded moment—that tree felling was an inherently dangerous activity. We do not accept or use Mr. Gallaway's statement as an admission on this issue by BSA. But, his statement does lend support to the trial court's determination from a layman's point of view. Our decision is also supported by the only case called to our attention by either party that directly addresses the issue. *See Maehl v. O'Brien*, 283 Cal.Rptr. 23 (Cal.Ct.App.1991), *vacated on other grounds*, 286 Cal.Rptr. 778, 818 P.2d 61 (1991). We limit our ruling to trees of the size encountered here. We fully recognize there is a difference of kind and not just degree between cutting down a ten- or fifteen-foot tree in one's front yard, and felling a sixty-foot tree on a hillside within falling distance of a power line.

{100} Finding that felling large trees is inherently dangerous does not compel a ruling that joint and several liability must be imposed on BSA. *See Abeita v. Northern Rio Arriba Elec. Coop.*, 1997–NMCA–097, ¶ 10, 124 N.M. 97, 946 P.2d 1108. We must still determine whether the rationale of *Saiz* should be applied to a case that does not involve the more common employer/independent contractor factual pattern and that was not tried on a theory of strict liability. The jury instructions required a finding of negligence for BSA's failure to impose policies prohibiting untrained persons from undertaking tree felling, or for its failure to provide adequate training and safety instruction. The question is whether these distinctions are sufficient to make the policy considerations and legal theory of *Saiz* inapplicable. We hold they do not.

{101} *Saiz* is grounded on a theory of nondelegable duty and direct liability of property owners and other employers of independent contractors hired to undertake inherently dangerous jobs. Our Supreme Court specifically rejected any connection between the concept of vicarious liability and nondelegable duty as it used those terms in *Saiz*. In doing so, our Supreme Court consciously turned its back on those commentators and treatises which treat inherent danger as simply the basis for an exception to the general rule of employer non-liability for the acts of independent contractors. Our Supreme Court cited W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 71 at 511 (5th ed.1984) and 5 Fowler V. Harper et al., *The Law of Torts* § 26.11 at 84–93 (2d ed.1986), as examples of the theoretical treatment it was rejecting. *See Saiz*, 113 N.M. at 399, 827 P.2d at 114.

{102} Though it relied on the Restatement to describe inherent danger and the owner/employer's duty of care, our Supreme Court also implicitly rejected any vicarious liability basis for the Restatement rules. That is the import of our Supreme Court's language when it stated in *Saiz:*

> The *focus* is on the presence or absence of a necessary precaution, not on whether an independent contractor's failure to take the precaution may be excused or justified under a reasonably prudent person standard. The test of liability is the presence or absence of precautions that would be deemed reasonably necessary by one to whom knowledge of all the circumstances is attributed; and liability is dependent on neither the lack of care taken by the contractor nor the lack of care taken by the employer to ensure that the contractor takes necessary precautions.

*Id.* at 395, 827 P.2d at 110. And again when it stated:

> There may be reasons for the jury also to decide and apportion fault among independent contractors and others, but if the only question is the liability of an employer for injury proximately caused by the absence of a necessary precaution against the peculiar risks of an inherently dangerous activity, fixing fault of the independent contractor is not required.

*Id.* at 396, 827 P.2d at 111. And later when it observed:

> The common law develops by steps manifesting the imprint of established doctrines. Courts that lengthen the stride of the common law are wont to do so in well-worn and familiar doctrines. So we believe is the character of the imprint on nondelegable duty left by the rationale encompassing "vicarious liability to the same extent as the independent contractor." It should not be required that the contractor be liable. That is not the point. The court determines the presence of a peculiar risk and the need for precautions. The fact finder defines what reasonable precautions were necessary. Liability is based upon a showing of injury proximately caused by the absence of the necessary precautions. What the independent contractor knew or should have known is not at issue.

*Id.* at 399, 827 P.2d at 114.

{103} The lesson we glean from the discussions in *Saiz* is that the relationship between the owner/employer and the independent contractor is not, and should not be, the focus of the inquiry in these cases. That inquiry is necessary only if the aim is to divide liability between them. If the law imposes strict liability for failure to undertake reasonable precautions, the more perti-

nent inquiry is the connection of the parties to the inherently dangerous activity and their respective ability to control or influence how the work is to be done and how the peculiar risks raised by the activity are to be handled.

{104} Our Supreme Court in *Saiz* recognized that a property owner or other employer of an independent contractor has both the power and personal interest, flowing from his position vis-a-vis the contractor and the property, to control or influence how the inherently dangerous activity will be conducted. By holding that the owner/employer's duty to provide reasonable precautions against the danger continues regardless of what the independent contractor does or does not do, the Court provided a real incentive to owner/employers to remain actively interested in the work. As a further incentive, based on a public policy concern to maximize the care taken by persons procuring, undertaking, or otherwise sufficiently connected with inherently dangerous activity to have some influence on its conduct, our Supreme Court imposed joint and several liability on owner/employers.

{105} The emphasis on a party's connection with or control of the inherently dangerous activity helps explain the result in *Abeita*. There, we refused to apply joint and several liability to the defendant electric cooperative for the negligence of a homeowner who failed to halt construction activity on a garage being built directly underneath the cooperative's high power line until the line could be moved. *See Abeita*, 1997–NMCA–097, ¶ 17, 124 N.M. 97, 946 P.2d 1108. While we recognized that the electric cooperative may have had "some nondelegable duties with respect to safety at the construction site[,]" we also noted that it had no authority, and thus had no duty, to actually halt construction activity. *Id.* ¶ 15, 124 N.M. 97, 946 P.2d 1108. This is a recognition that the electric cooperative had limited authority over the construction work, the activity which placed the decedent in harm's way. Our ruling further recognized that requiring the electric cooperative to pay for the consequences of construction activity that it had no authority to prevent would be improper. In the language of *Saiz*, stopping construction

would not be a reasonable precaution required of the electric cooperative because the cooperative had no power to stop the construction.

{106} Turning to our case, BSA cannot successfully argue that it was similarly powerless to do anything to affect or alter the practice of felling large dead trees on scout camp properties using untrained persons as workers. First, one of the facets of the sanction imposed on BSA was a finding that it exerted or retained enough control over Council affairs to impose a direct duty of care upon it with regard to safety issues. Since we have upheld the sanction imposed by the trial court, BSA's arguments concerning its lack of any duty toward Plaintiff based either on its remoteness from the activity, or the relative autonomy of its local Councils are unavailing. For the same reason, the cases finding BSA not responsible for local council activities are irrelevant. *See, e.g., Anderson v. Boy Scouts of America, Inc.*, 226 Ill.App.3d 440, 168 Ill.Dec. 492, 589 N.E.2d 892, 894–95 (Ill.App.Ct.1992); *M.L. v. Civil Air Patrol*, 806 F.Supp. 845, 848 (E.D.Mo.1992); *Wilson v. U.S.*, 989 F.2d 953, 958–59 (8th Cir.1993); *Wilson v. St. Louis Area Council, Boy Scouts of America*, 845 S.W.2d 568, 570–72 (Mo.Ct.App.1992); *Souza v. Narragansett Council, Boy Scouts of America*, 488 A.2d 713, 715 (R.I.1985).

{107} In addition to the finding of control based on the sanction, there are other indicators in the record that support a determination of a duty on the part of BSA in this context. For example, the organizational documents of BSA and its local councils reveal that BSA's rules and regulations allow BSA to retain a large degree of potential control of all aspects of council activities. We have outlined the applicable provisions of BSA's and local council organizational documents earlier in this opinion. The potential reach of BSA's authority is epitomized by its authority to refuse to renew the charter of a local council. Termination of the charter means that the local council cannot engage in or claim the sponsorship of BSA for scouting activities. Termination of the charter can also result in a local council losing its property to BSA or another council designated by

BSA. Given the prevalence and popularity of scouting in the United States and worldwide, it would be naive to believe that the possibility of losing a charter is not a powerful incentive to local councils to abide by BSA rules, regulations, and other pronouncements. On perhaps a more uplifting note, the positive aspects of scouting in millions of boys' lives is clearly a further incentive for local councils to follow BSA rules and regulations so that they can continue their good work through the scouting program.

{108} On a more practical level, BSA is much better equipped than local councils, financially and in terms of staff, to consider and deal with the safety issues. In 1991 and 1992, BSA collected approximately $9.1 million dollars from fees paid by volunteers alone, none of which was returned to local councils. BSA's total income in 1992 was approximately $54 million dollars. It maintains a total staff of some 3000 persons, including an estimated 300 full time employees working in departments designed to review accidents and create policies, procedures, and literature to enhance the safety of those involved in scouting. It maintains a health and safety division devoted specifically to safety and risk management issues. It receives reports about all accidents and injuries nationwide involving scouts, council employees and volunteers. These resources give it the wherewithal to gauge sources of risks and design responses much more effectively than any local council could muster.

{109} BSA already publishes numerous safety guides and regulations, including outright bans on some scouting activities such as use of chain saws by scouts, bungee jumping, and parasailing. BSA requires pre-camp inspections and imposes standards that the summer camps run by local councils have to meet before BSA will certify them for scouting use. BSA's power in this regard is clearly broader than merely being able to suggest or make recommendations to local councils. Failure of BSA to certify a summer camp precludes use of the camp by boy scouts under BSA or local council sponsorship.

{110} We are convinced BSA could issue and enforce a policy prohibiting use of untrained persons to fell large dead trees. This is a sufficient connection with the activity to allow imposition of a *Saiz* duty on BSA. BSA does not deny it could impose such a policy; it only says it has not done so. Its failure to act to meet the dangers posed by what we agree is an inherently dangerous activity does not shield it from liability. Combining the inherent danger of the activity with BSA's duty "dictates the imposition of joint and several liability." *Saiz*, 113 N.M. at 400, 827 P.2d at 115.

{111} Having determined that the principles of *Saiz* apply, we now consider whether there are any reasons why it would be inappropriate to apply them in this case. BSA advances two reasons: First, that Plaintiff was an employee of the Council and thus his exclusive remedy is under the WCA. Second, imposition of joint and several liability would result in impermissible double recovery under the WCA. We are unpersuaded.

{112} BSA relies on two California cases in support of its first reason. *See Privette v. Superior Court (Contreras)*, 5 Cal.4th 689, 21 Cal.Rptr.2d 72, 854 P.2d 721 (Cal.1993) (In Bank); *Whitford v. Swinerton & Walberg Co.*, 34 Cal.App.4th 1054, 40 Cal.Rptr.2d 688 (Cal.Ct.App.1995). BSA does not cite or rely on *New Mexico Elec. Serv. Co. v. Montanez*, 89 N.M. 278, 551 P.2d 634 (1976), which stands for the same proposition as *Privette* and *Whitford*. These cases hold that employees of an independent contractor may not pursue an action for injuries against the employer of the independent contractor even if the injuries occurred as a result of undertaking inherently dangerous work. In *Montanez*, our Supreme Court held that the employer of an independent contractor owed no duty of care to the employees of the independent contractor under Sections 413, 416, and 427 of the Restatement. 89 N.M. at 281–82, 551 P.2d at 637–38. Our Court determined that the term "others" in these sections of the Restatement did not include employees of independent contractors actually doing the work. Our Court apparently found it anomalous that the employer could become "an insurer" of its contractor's employees and thus be subjected to greater liability than if it had done the work itself. 89 N.M. at 282, 551 P.2d at 638. *Privette* and *Whitford*

come to the same result for basically the same reasons. 21 Cal.Rptr.2d 72, 854 P.2d at 724, 726 and 40 Cal.Rptr.2d at 691–92.

{113} *Montanez, Privette,* and *Whitford* do not apply here because they are premised on the existence of an employer and independent contractor relationship between the defendant and the injured worker's employer. That is not the situation here. Plaintiff did not try to prove such a relationship between BSA and the Council. And, BSA's position throughout has been that it is legally and factually separate from the Council and has no control over or significant connection with local activities. Thus, none of the reasons for the *Montanez* rule, including its pass-through theory of WCA premium payments, are present here.

{114} In addition, the rule in *Montanez* is subject to a significant exception: If the employer of an independent contractor retains control over the work to be performed, it also retains and owes a duty of care to the independent contractor's employees to provide a reasonably safe work place. *See Valdez v. Cillessen & Son, Inc.,* 105 N.M. 575, 579, 734 P.2d 1258, 1262 (1987); *Moulder v. Brown,* 98 N.M. 71, 76–77, 644 P.2d 1060, 1065–66 (Ct.App.1982); *DeArman,* 75 N.M. at 45, 400 P.2d at 219. The essence of Plaintiff's theory against BSA is its ability to control the operation of felling large trees on scout camps.

{115} BSA's double-recovery argument is premised on the notion that any payment to an injured worker of sums not eligible for reimbursement to the worker's employer is forbidden. Under NMSA 1978 Section 52–1–10.1 (1987) the "employer's right to reimbursement from the proceeds of the worker's recovery in *any action against any wrongdoer* shall be diminished by the · percentage of fault, if any, attributed to the employer or those for whom the employer is responsible, other than the injured worker." The essence of BSA's theory is that the unreimbursed portion of the worker's recovery cannot be paid to the worker by anyone. BSA correctly points out that under a joint and several liability judgment, it will be required to pay the Council's fifteen percent share. While we agree that BSA will be liable for the Council's share of the total comparative fault, we disagree that that payment is contrary to the letter or spirit of the WCA.

{116} We have already summarized the letter of Section 52–1–10.2. It expressly diminishes the employer's right to reimbursement by the employer's percentage of fault. In *Gutierrez v. City of Albuquerque,* 121 N.M. 172, 178, 909 P.2d 732, 738 (Ct.App.), *cert. granted,* 120 N.M. 828, 907 P.2d 1009 (1995), we recognized that Section 52–1–10.1 provided one legislatively recognized instance in which the injured worker could recover both workers' compensation benefits and the worker's full measure of tort damages, even if that would amount to "double recovery." The legislature having provided an exception to the usual rule prohibiting double recovery found in the reimbursement section of the workers' compensation laws, NMSA 1978, § 52–5–17 (1990), we cannot say that there is anything in the spirit of the WCA that would prohibit the imposition of joint and several liability that we have already recognized. Additionally, we agree with Plaintiff that any right to reimbursement under Section 52–5–17, as modified by Section 52–1–10.1, belongs to the Council, not BSA.

{117} The only entity served by refusing to impose joint and several liability as suggested ·by BSA would be the third party wrongdoer. Applying a WCA concept in favor of a third party who is a stranger to a WCA transaction serves no public policy goal of which we are aware. In fact, to do so would subvert the goals of full compensation and the encouragement of safety by providing a windfall to the third party wrongdoer. *See Mountain States Mut. Cas. Co. v. Vigil,* 1996–NMCA–062, 121 N.M. 812, 918 P.2d 728 (insured motorist carrier not allowed to claim a credit against uninsured motorists benefits for worker's compensation benefits paid and unreimbursed by agreement with worker's compensation carrier); *Nieman v. Heil Co.,* 471 N.W.2d 790, 791 (Iowa 1991) (denying a prejudgment credit in the amount of worker's compensation benefits received against products liability judgment against manufacturer); *Unsatisfied Claim & Judgment Fund Bd. v. Salvo,* 231 Md. 262, 189 A.2d 638, 639 (Md.1963) (judgment against unsat-

isfied claim fund not permitted to have judgment reduced by amount of worker's compensation benefits received by cab driver).

{118} As Professor Larson noted:

The concept underlying third party actions is the moral idea that the ultimate loss from wrongdoing should fall upon the wrongdoer.... It should never be forgotten that the distortions of our old-fashioned fault concepts that have been thought advisable for reasons of social policy are exclusively limited to providing an assured recovery for the injured person; they have never gone on—once the injured person was made whole—to change the rules on how the ultimate burden was borne.

. . . .

So, it is elementary that if a stranger's negligence was the cause of injury to claimant in the course of employment, the stranger should not be in any degree absolved of his normal obligation to pay damages for such an injury.

. . . .

The obvious disposition of the matter is to give the employer so much of the negligence recovery as is necessary to reimburse him for his compensation outlay, and to give the employee the excess. This is fair to everyone concerned: the employer, who, in a fault sense, is neutral, comes out even; the third person pays exactly the damages he would normally pay, which is correct, since to reduce his burden because of the relation between the employer and the employee would be a windfall to him which he has done nothing to deserve; and the employee gets a fuller reimbursement for actual damages sustained than is possible under the compensation system alone.

Someone may argue that the employee has no right to this excess, having had the benefit of the compensation system; but the answer is that, as between the employee and the stranger, there has been no such give and take, no such compromises struck, as between the employee and his own employer. The employer has made substantial concessions as the price of his limited liability; the employee has given up his right against his own employer to bring damage suits. But the stranger has given up nothing, and hence has a right to claim nothing resembling the immunities that exist between employer and employee. As for the employee, he gets no windfall; what he gets is nothing more than actual restoration to himself of what he has lost because of the third person's wrongful act.

6 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* §§ 71.10 & 71.20 (1997) (footnotes omitted).

{119} On balance, public policy and legal theory support application of joint and several liability to this case against BSA and we so hold.

## II. *Punitive Damages—Directed Verdict*

{120} Plaintiff appeals the trial court's granting of BSA's motion for a directed verdict on his claim for punitive damages. On appeal, we view the evidence in the light most favorable to the non-moving party, indulging every reasonable inference and ignoring conflicts in the evidence unfavorable to that party. *See Bourgeous v. Horizon Healthcare Corp.*, 117 N.M. 434, 437, 872 P.2d 852, 855 (1994); *Sanchez v. Wiley*, 1997–NMCA–105, ¶ 14, 124 N.M. 47, 946 P.2d 650.

{121} Because the purpose of punitive damages is to punish, New Mexico case law requires that the wrongdoer must have a culpable mental state, and that its conduct must rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level. *Clay v. Ferrellgas, Inc.*, 118 N.M. 266, 269, 881 P.2d 11, 14 (1994). The wrongdoer's conduct should be viewed in light of the risks of danger arising from the activity. As the risk increases, "conduct that amounts to a breach of duty is more likely to demonstrate a culpable mental state." *Id.*

{122} Plaintiff points to three items of evidence to support his assertion of error: (1) Keith Gallaway's admission that "BSA knew tree-felling was an inherently dangerous activity for untrained volunteers and council employees"; (2) Mr. Gallaway's "admission" that BSA made an intentional, economics-based decision to use untrained vol-

unteers rather than hire a professional tree cutter; and (3) BSA "knew" that Dick Davis, the Council Ranger, had no formal training as a professional tree cutter, regularly failed to use any safety equipment, and was reckless when it came to cutting trees.

{123} We have been unable to verify the last of these three factual bases from the record after careful review. We therefore do not believe it can be used to support reversal. In addition, we do not believe Mr. Gallaway's testimony can reasonably bear the interpretation placed on it by Plaintiff, and, in any event, it does not provide any information as to BSA's knowledge or its policies prior to Plaintiff's injury.

{124} Mr. Gallaway's statements concerning the economics of hiring professional tree cutters were elicited by the following questions and others to the same effect:

> McGINN: There is nothing that prevents BSA from hiring full time (inaudible) campers (inaudible) qualifies as a professional to take down the hazardous trees nationwide is there sir?

3. McGINN: Well let me ask you, you don't have a policy still that prohibits volunteers even after Mr. Enriquez was brain damaged four years ago, you still don't have a policy that prevents volunteers and untrained people from taking down large dead trees do you sir?

GALLAWAY: We do not have a national policy.

McGINN: (inaudible) policy like that.

GALLAWAY: I don't know that.

McGINN: How many people will it take that are being hurt or injured before you have such a policy like that?

GALLAWAY: That's an impossible question for me to answer.

McGINN: You would admit Mr. Gallaway that BSA national is in a much better position to look at all of the injuries nationwide and assess what things might be dangerous to its volunteers.

GALLAWAY: Yes, and we do have a committee, we have a national health and safety committee, a group of volunteers who are eminently more qualified then any of our paid professional staff to do just that. We do evaluate those accident reports and the incidents that we have. We take a look at our national exposure on constant basis and they review that.

McGINN: And let me ask you about national exposure. Does it help you evolve sometimes for a jury to determine and decide that perhaps one of your policies is a mistake. And return a verdict against BSA.

GALLAWAY: I would see a very practical problem with that. And that would be the, just the sheer volume of work. I don't think we would have the financial resources to do that.

McGINN: Okay. For two hundred twenty-eight thousand dollars, (inaudible) wouldn't be enough to hire person, hire a professional to take out hazardous trees?

GALLAWAY: Not for the number of camps that we have, I'm not sure what the total number of camps are. And certainly not at $800 a tree.

This testimony was directed solely at approaches BSA might be able to take in the future to lessen the risk of untrained persons cutting down large trees. It does not provide any information concerning BSA's awareness prior to Plaintiff's injury of the dangers posed by tree felling or any consideration by BSA of the economics of hiring professional tree cutters prior to his injury.

{125} Similarly, Mr. Gallaway's testimony concerning his recognition of the inherent dangerousness of tree felling was forward-looking.[3] This testimony did not address in

> GALLAWAY: I need to think it helps us the most when we recognize an unsafe condition and figure out what to do with it.
> McGINN: And you haven't recognized yet cutting down large dead trees is an unsafe thing.
> GALLAWAY: I don't think there is any question but what that's an inherently dangerous activity. I'm not sure the guidelines exist any place that give us the guidance to tell us what we ought to be doing.
> McGINN: Alright. Do you think you should come up with specific precautions or special precautions when they ask volunteers or untrained people to be involved in inherently dangerous activities?
> GALLAWAY: We would hope that our local council does just that, we can't be in every Boy Scout Camp or Boy Scout service center or city park where a cub day camp is held or swimming pool where aquatic activities are conducted at. As a national organization we do not have those kinds of resources nor do we have the personnel to do that.
> McGINN: Well let me ask you ... I'm sorry Mr. Gallaway. I apologize. Go ahead.
> GALLAWAY: I just broke my chain of thought, or maybe you broke my train of thought. But I'm sorry. What was your initial question?
> McGINN: Let me ask another question. Do you think that the lives of your volunteers should be more important to protect than BSA's money?
> GALLAWAY: There is nothing more precious to us than the welfare of the volunteers and the children we serve.

any way the extent, if any, to which BSA recognized the danger prior to Plaintiff's injury. Even if it is viewed as an admission by BSA as an entity the testimony only addresses the issue as of the time of trial.

{126} The record is devoid of any evidence, such as prior similar injuries, which might create a jury question concerning BSA's state of knowledge, attitude, or response to dangers it knew or should have known about prior to Plaintiff's injury. We do not believe a jury question could be created without some evidence of BSA's knowledge prior to Plaintiff's injury concerning the dangers of felling large dead trees. *Cf. Ruiz v. Southern Pac. Transp. Co.*, 97 N.M. 194, 638 P.2d 406 (Ct.App.1981).

{127} The fact that the activity has now been found to be inherently dangerous does not necessarily fill the gap. Even if we assume that the dangers inherent in tree felling improperly escaped the attention of BSA prior to Plaintiff's injury, this, by itself, does not support an inference that BSA's failures prior to the injury were accompanied or prompted by a culpable state of mind.

{128} In this regard, this case is different from cases such as *Clay*, 118 N.M. at 269, 881 P.2d at 14 and *Hinger*, 120 N.M. at 445–47, 902 P.2d at 1048–49. In these cases, there is no question that the dangers posed by the instrumentality or product involved therein were well known and appreciated by the defendants' employees. The only question was whether the acts or omissions of the defendants' employees, in the face of known dangers, could reasonably be deemed to demonstrate a culpable mental state.

{129} Plaintiff is aware of this difficulty with his case. As a back-up position he argues that "the trial court should have denied the motion for a directed verdict because BSA's culpable mental state may be inferred by [its] blatant failure to produce discovery aimed at proving punitive damages, i.e., prior accidents and injuries involving tree felling activities nationwide." The difficulty for Plaintiff is that this argument is actually a plea for further sanctions against BSA. Plaintiff made the same argument to the trial court when he opposed BSA's motion, and he was denied relief. As an appel-

late court, we are not in a position to impose further sanctions not granted, and in fact denied, below. We will not disturb a trial court ruling of this type in the absence of an abuse of discretion. Plaintiff does not argue explicitly that the trial court abused its discretion in denying this further sanction. This is reason enough to uphold the trial court. In addition, we refuse to find error here for essentially the same reasons we uphold the sanctions which were imposed.

{130} We have carefully considered Plaintiff's other arguments in the cross appeal. We do not find them meritorious, and we therefore affirm them summarily.

### APPEAL OF COCHRAN VERDICT

{131} Plaintiff asks us to grant a new trial against Defendant Cochran on the basis of three statements made by Cochran's counsel (Counsel) during closing argument. Plaintiff asserts the statements were improper and unfairly prejudicial and that the trial court failed to properly react to the statements in that it did not give an instruction regarding Cochran's insurance coverage. We review this challenge under the abuse of discretion standard. *See Gallegos v. New Mexico Bd. of Educ.*, 1997–NMCA–040, ¶ 30, 123 N.M. 362, 940 P.2d 468. The appellant bears the burden of demonstrating that the trial court abused its discretion. *See Coastal Plains Oil Co. v. Douglas*, 69 N.M. 68, 71, 364 P.2d 131, 133 (1961).

{132} Plaintiff complains about three statements made by Counsel during closing argument. Reported in the order made to the jury, with intervening argument deleted, they are:

> When we put on our part of the case, you didn't see any fancy experts. You didn't see any doctors. You didn't see any coroners. You didn't see any rehab specialists. All you saw was Larry Cochran. He doesn't have a lot of fancy words or fancy clothes. He's not sophisticated. He can't tell you like a physicist could what caused the accident, but he can tell you the facts of what happened the day he was out there

helping, and what he told you was the truth.

There are huge damages in this case if you think that Larry Cochran did something wrong. The plaintiff is asking for millions and millions of dollars to be awarded to the plaintiff. Does Larry Cochran have the resources?

The third part is the amount of damages that you are going to award. And there all I'd like to say is this: We're all working people. Larry Cochran is a working man. Use your discretion. Use common sense.

In essence, Plaintiff asserts that Counsel injected an improper factor into the jury's consideration and left the false impression that Mr. Cochran would have to pay any judgment out of his own resources creating a financial hardship on him. Our task is to determine whether these three statements "transgressed the grounds of professional duty" or constituted "prejudicial misconduct in argument presented to the jury." *Grammer v. Kohlhaas Tank & Equip. Co.*, 93 N.M. 685, 693, 604 P.2d 823, 831 (Ct.App.1979); *see also Beal v. Southern Union Gas Co.*, 66 N.M. 424, 442, 349 P.2d 337, 349 (1960). In doing so, we consider the evidence, the arguments themselves, the prejudicial effect of the argument in light of the evidence, and any limiting or cautionary instructions of the trial court. *See Otis Elevator Co. v. Stallworth*, 474 So.2d 82, 83 (Ala.1985).

{133} We recognize that Counsel had considerable latitude in her closing argument. *See Gallegos*, 1997–NMCA–040, ¶ 33, 123 N.M. 362, 940 P.2d 468; *McDowell v. Napolitano*, 119 N.M. 696, 702, 895 P.2d 218, 224 (1995). However, in this case, Counsel's last two statements exceeded the bounds of permissible argument and were prejudicial. *See* 88 C.J.S. *Trial* § 190 (1955) ("Comments relating to the poverty or wealth of the parties which are not sustained by the evidence are improper."); *cf. Holt v. State Farm Mut. Auto. Ins. Co.*, 507 So.2d 388, 392 (Ala. 1986) (stating test for reversible error, when trial court overrules the objection and fails to instruct the jury to disregard the improper argument, as not whether the argument "unlawfully influence[d] the jury, but whether it might have done so."). The danger of intro-

ducing the wealth of the parties is its potential to influence the jury's deliberation as to liability issues on irrelevant grounds. In addition, argument must have some basis in the evidence presented during trial. *See Connolly. v. Nicollet Hotel*, 258 Minn. 405, 104 N.W.2d 721, 732 (Minn.1960) (counsel is given wide latitude in closing argument so long as it is based on the evidence and proper inferences therefrom); *Norfolk & W. Ry. Co. v. Greening*, 458 S.W.2d 268, 273 (Mo.1970) ("Of course, closing argument should be based on facts in evidence[.]"). Counsel's statements relating to her client's lack of resources find no support in the record adduced at trial.

{134} Most importantly, argument cannot be allowed to leave a palpably inaccurate impression with the jury. Here, Counsel was clearly aware of existing insurance coverage through BSA that was arguably sufficient to cover any damages awarded against Cochran. *See Haid v. Loderstedt*, 45 N.J.Super. 547, 133 A.2d 655, 657 (N.J.Super.Ct.App.Div.1957) ("[T]he act of conveying the information to the jury by a defendant is more deserving of condemnation when the actor knows the implied fact is untrue. And so the inclination of a court to find prejudicial error in such a situation is more readily stimulated."). Counsel's comments are similar to those made in *Schultz v. Siddens*, 191 Ill.App.3d 622, 138 Ill.Dec. 857, 548 N.E.2d 87, 90 (Ill.App.Ct.1989). There, defense counsel stated during his closing argument that the plaintiff was asking the jury "to take money away from [the defendant] and to take his property." After objections by plaintiff's counsel, the trial court ordered the jury to disregard the statements. *See id.* Defense counsel in *Schultz* made his remarks knowing a special fund had been reserved for the defendant. The *Schultz* court noted that the remarks "were obviously designed to elicit sympathy for the defendant and prejudice the jury ." *Id.* Further, despite having already reversed on another ground, it noted that such comments were "improper and should not be repeated at retrial." *Id.*

{135} Cochran contends that the improper statements do not constitute reversible error since the statements related to

damages. He argues that since the case was decided on the basis of liability, the statements should not be considered sufficiently improper to require reversal. *See Britton v. Boulden,* 87 N.M. 474, 475–76, 535 P.2d 1325, 1326–27 (1975) (holding that alleged errors in instructions on damages need not be reached when jury did not find liability); *Sandoval v. Cortez,* 88 N.M. 170, 173, 538 P.2d 1192, 1195 (Ct.App.1975) (same). Cochran's focus is too narrow. We review the statements made to the jury in order to ascertain whether they rose to the level of prejudicial misconduct with the reasonable potential to improperly affect the verdict. A jury finding of no liability is not an absolute bar to reversal, but it is obviously a reason to be cautious in our consideration of whether the statements can be deemed sufficiently prejudicial to call into question the jury's verdict. The reason for this inquiry is simple: "A jury's resolution of the issues in a case must be based upon applicable rules of law and the evidence properly presented at trial, 'not upon the economic condition of either party 'or the degree of burden that might result from a verdict or judgment.'" *Holt,* 507 So.2d at 391 (citation omitted); *see also Griego v. Conwell,* 54 N.M. 287, 291–92, 222 P.2d 606, 609 (1950) (Supreme Court reserving the right in the proper case to reverse a judgment and award a new trial when counsel "go outside the record, or . . . attempt to inflame the minds of jurors.").

{136} Next, we review the effect of any limiting or cautionary actions of the trial court. Cochran argues that even if the statements were improper, the trial court's admonishment and the jury instructions cured the taint. We recognize that the jury is presumed to have followed the instructions. *See Britton,* 87 N.M. at 475, 535 P.2d at 1326. There comes a point, however, when the statements are sufficiently prejudicial to overcome the presumption. This is such a case. The trial court did nothing in response to Plaintiff's objections beyond instructing the jury to "ignore the last remark" after Counsel's second statement. This single admonition, in the absence of other cautionary or corrective instructions, was insufficient to meet the false impression left by Counsel's statement. *See Sutherlin v. Fenenga,* 111

N.M. 767, 777, 810 P.2d 353, 363 (Ct.App. 1991) (admonitions of court were insufficient to correct prejudice resulting from counsel's improper statements during voir dire emphasizing insurance); *State v. Rowell,* 77 N.M. 124, 419 P.2d 966 (1966).

{137} Plaintiff requested an instruction informing the jury that Cochran was covered by insurance. The trial court refused to give one. We caution that we are not deciding such an instruction would have been sufficient to cure the problem posed by Counsel's statements. *See Does v. Roman Catholic Church of the Archdiocese of Santa Fe, Inc.,* 1996–NMCA–094, ¶ 12, 122 N.M. 307, 924 P.2d 273 ("[C]ourts traditionally do not reach out to decide issues unnecessarily."). However, failure to give the instruction may be viewed in conjunction with the other factors noted above in determining whether the prejudicial effect of the statements were cured at the trial court level. *See Otis Elevator Co.,* 474 So.2d at 83.

{138} We conclude that the last two statements made to the jury were improper and prejudicial. *Cf. Holt,* 507 So.2d at 391 ("This Court has consistently recognized that a reference by counsel for either party to the wealth or economic condition of either party is improper and prejudicial."). Further, the cautionary actions of the district court were not sufficient to meet the resulting prejudice. Finally, although we agree with Cochran that the evidence of his negligence was far from overwhelming (as Plaintiff contends it was), we are frankly at a loss to explain why the jury assessed Plaintiff with ten percent of the negligence while assessing Cochran with zero. The most plausible explanation is that the jury was, in fact, impressed with Counsel's argument about Cochran's lack of resources. Consequently, we reverse the decision and remand for a new trial against Cochran. *See Grammer,* 93 N.M. at 693, 604 P.2d at 831 ("[A] judgment will be reversed and a new trial ordered where lawyers go outside the record when they address the jury or attempt to influence the minds of the jury against opposing litigants.").

## CONCLUSION

{139}   The judgment is affirmed as to all issues raised by BSA in its appeal.   The judgment is reversed and remanded to the trial court for entry of an amended judgment against BSA providing for joint and several liability.   The trial court is affirmed as to all other issues raised by Plaintiff's Cross–Appeal.   The judgment on the verdict in favor of Defendant Cochran is reversed, and the matter is remanded for a new trial as to him. Plaintiff is awarded costs on appeal.

{140}   **IT IS SO ORDERED.**

PICKARD, and FLORES, JJ., concur.

